1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RACARDO JACKSON,                          No.  2:14-cv-2268 MCE DB P

12                   Petitioner,

13          v.                                  FINDINGS AND RECOMMENDATIONS

14   MARTIN BITER,

15                   Respondent.

16

17          Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for a

18   writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges his conviction imposed by

19   the Solano County Superior Court in 2010 for second degree murder with a firearm enhancement.

20   Petitioner alleges:  (1) his Miranda rights were violated when the prosecutor questioned witnesses

21   and argued about petitioner's post-Miranda silence and about his statements made after he

22   invoked his right to counsel; (2) appellate counsel was constitutionally ineffective when he failed

23   to raise the Miranda claims; (3) trial counsel was constitutionally ineffective during plea

24   negotiations; and (4) the exclusion of evidence of the victim's violent past violated petitioner's

25   due process rights.  For the reasons set forth below, this court will recommend the petition be

26   granted on the grounds that petitioner's Miranda rights were violated when the prosecutor

27   referenced petitioner's silence numerous times during trial.

28   ////

1

# BACKGROUND

## I.      Facts Established at Trial

The California Court of Appeal for the First Appellate District provided the following summary of the evidence presented at trial:

### The Prosecution

### Testimony

On July 15, 2007, approximately 3:30 a.m., Officer Frank Piro responded to a call regarding a shooting. He spotted medics attending to Thompson. The medics placed Thompson in the ambulance and Piro traveled with him in the ambulance. Piro advised Thompson that he might die and asked him to identify who shot him. After a few seconds, Thompson responded, "Pete." When asked where Pete lived, Thompson responded, "Richmond." Piro continued to ask questions but Thompson was unable to answer. Detective James Carden testified Thompson was pronounced dead at 5:45 a.m.

Katy May Permenter testified regarding the events related to the killing of Thompson. She asserted that she had known Thompson for about one year before he was killed. They had been involved in a sexual relationship but had agreed to see other people.

Prior to the killing, Permenter had known defendant, who went by the name of "Pete," for about six months. She had a sexual relationship with defendant; defendant also had other girlfriends.

After losing her job in a shoe store, Permenter became a prostitute for, at most, two months. Defendant was her pimp. When Permenter told Thompson that defendant was her pimp, he became upset and jealous even though Thompson was also a pimp.

On July 14, 2007, Permenter moved from Vacaville to an apartment on the second floor in Fairfield. In the evening after the move, she asked defendant to come to her place; he came to the new apartment about 10:00 p.m.

Defendant and Permenter went to sleep around midnight when Thompson began calling on the phone and waking her. She did not answer the phone; Thompson then began to text her. He told her that he wanted to come to her place. She texted him and told him that she had company and did not want him to come to her place. Despite her telling him not to come, he told her that he was coming. Phone records indicated that Thompson left 14 or 15 text messages at Permenter's phone number between 12:39 a.m. and 3:30 a.m. on July 15, 2007. The record also established that he called Permenter 17 or 18 times between 1:15 and 3:30 a.m. on this same date.

Permenter testified that Thompson arrived at her door 20 minutes after he first told her he was coming. Thompson pounded on the door and yelled for her to come outside. Defendant awakened and calmly

dressed. Permenter told defendant that it was Thompson and that he should let Thompson leave. Permenter's phone rang and she answered it. Thompson was on the line; she told him to leave because she had company. She told him that she was not his girlfriend. The knocking and phone calls stopped and Permenter believed that Thompson had left.

Permenter told defendant that she did not want to have any problems and asked him to leave. Defendant left the apartment for a few minutes.

Defendant saw Joseph Charles Pickett, who lived in the apartment directly below Permenter's apartment. He was in front of his apartment in the parking lot smoking a cigarette. Defendant asked him if he had seen someone knocking on the door of the above apartment. Pickett told him that he had not seen anyone at the door but earlier he had seen someone in the dumpster area in the parking lot. Defendant returned to Permenter's apartment.

Defendant asked Permenter where Thompson lived and whether he was going to have to look for him to determine what Thompson's problem was. Defendant left again and drove away. According to Pickett, he noticed that defendant returned 30 or 45 minutes later. Permenter testified that defendant returned about 20 minutes later. [1]

At some point, Thompson returned to Permenter's apartment building. He remained at the bottom of the stairs and began yelling her name, cursing, and acting irrationally. He acted as if he were high or drunk. Permenter noticed that Thompson had his hand in his pocket and she wondered whether he had a gun. She knew that Thompson kept a gun.

Permenter told defendant not to go outside and to let Thompson leave. Defendant, however, went outside. Permenter remained in the doorway of her apartment.

Defendant went down the stairs and met Thompson on the stairs. Thompson had his phone in one hand and he kept his other hand in his jacket pocket. Permenter testified that she saw Thompson remove his empty hand from his pocket and show it to defendant. She stood in her open doorway and yelled that she was not either man's

---

[1] The court's description of the testimony here appears to be an error. This court's review of the transcript shows that, in her testimony, Permenter said petitioner left just once for a "few minutes" or a "couple minutes." (RT 296 (ECF No. 55-10), 320 (ECF No. 55-11).) She did not testify that he drove away. Nor did she testify that petitioner was gone from the apartment for 20 minutes. Pickett, however, testified that he was in the parking lot smoking when petitioner came out of the apartment and asked him if he had seen someone pounding on Permenter's door. (RT 405 (ECF No. 55-11).) Pickett further testified that he saw petitioner get in a car, drive away, and return about 30-45 minutes later. (RT 406-07.) However, Permenter testified that Thompson returned for the second time about 20 minutes after he left. (RT 322.) Because petitioner was in Permenter's apartment when Thompson returned, there is a conflict between Permenter and Pickett's testimony.

girlfriend and that they should leave as they were going to get her kicked out.

Permenter closed the door of her apartment. At that time, Thompson was at the bottom of the stairs. Seconds after closing the door, Permenter heard a series of gunshots. Permenter opened the door and saw Thompson running up the stairs. He asked for help and said, "Let me in." His white T-shirt was completely covered in blood. She grabbed him but he collapsed outside the door and she could not hold onto him.

Permenter was in shock and could not recall the exact events after that but defendant came up the stairs and wanted his phone and keys, which she had thrown outside. Defendant went to the bottom of the stairs, and then went to the parking lot. Defendant looked back at Permenter and said, "Bitch, you'd better not say my name." Defendant did not tell Permenter that Thompson had pulled a gun or assaulted him. Defendant calmly walked to his car and drove away.

Permenter banged on doors of other apartments and asked people to help and to call 911. A person told her that an ambulance was on the way.

Pickett was watching a pornographic movie on the computer in his bedroom when he heard arguing outside. He looked out his window and saw and heard five or six muzzle flashes from a gun. He could not see the people's faces outside the window but noticed there were two people and, from their builds and clothing, he believed one was defendant and one was the person he had seen earlier at the dumpster.

Pickett testified that defendant took a step back after the first two shots, and Thompson began to fall. After a slight pause of a half second or less, defendant pointed the gun downward and shot three or four more times. Pickett did not know whether Thompson had his hand in his pocket or whether he had a weapon. He did not see anything in Thompson's hand and did not see defendant remove a weapon from Thompson. He also did not see a gun on the ground near Thompson. Picket called 911. About 30 seconds later, Permenter came running downstairs and banged on the doors, yelling for help. He went outside to help and found Thompson upstairs.

**Expert Testimony, Physical Evidence, and the Autopsy**

The prosecution offered Detective William Shaffer as an expert "with respect to firearms." Defense counsel expressed reservations and reserved voir dire. The court permitted Shaffer to testify as an expert "subject to voir dire by [defense counsel] on cross-examination." Defense counsel cross-examined Shaffer without conducting voir dire.

The evidence showed that there were seven .357 caliber shell casings, a copper jacket from an expended bullet, and a recovered bullet recovered from the apartment building where Permenter lived. Most of the casings were in the landscaping between the sidewalk and the parking lot. In Shaffer's opinion, all of the casings and the

4

recovered bullet and copper jacket came from the same caliber weapon, a .357 SIG semi-automatic. The expended bullet appeared to be a hollow point; it had been fired and had passed through something.

A 1986 Toyota Supra registered to Thompson was parked in the apartment parking lot. The keys were in the ignition and the windows were partially down. The doors were unlocked.

On July 18, 2007, the police recovered from under the passenger seat in defendant's car a handgun and magazine with bullets in it wrapped in a plastic Target bag. There was no evidence at the scene consistent with this firearm.

Dr. Arnold Josselson, forensic pathologist, testified that the autopsy of Thompson revealed that he had five gunshot wounds, and two of them were fatal. He stated that Thompson suffered a gunshot wound on the left elbow and that it went in the back of his elbow. He also had a superficial gunshot wound on the right side of his back, a fatal gunshot wound in the right chest and abdomen, and two bullets in the upper abdomen. He also discussed a photograph, which showed the backside of the victim, and two gunshot wounds. He explained that one of the shots depicted in the photograph was the one he had described as going across the right side of Thompson's back and not entering his chest. There was no evidence of a fistfight. Drugs and alcohol were not in Thompson's body at the time of his death.

**Defendant's Statements to the Police**

The police arrested defendant at gunpoint at his apartment in Sacramento on July 25, 2007. Defendant waived his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and spoke to Detective Joshua Cohen.

Defendant's statements to Cohen were taped and played to the jury. Cohen asked defendant, "You know why we're all here, right?" Defendant responded, "I'm pretty sure." Defendant stated, "[Y]'all what I done, you like—you twisted it up in the media, y'all got I mean you know what I mean?" Cohen responded that they did not have defendant's "side."

Cohen told defendant that they did not know exactly what had happened. They knew that some shots were fired and one person took off and one person was on the ground. Defendant answered: "I'm pretty sure she told you everything. I don't know if she lied or what, but if she told you what everything you know, I don't know why y'all put it out there like that, though." Cohen said that they "talked to a whole bunch of people."

Cohen told defendant that "obviously" he had "a part" in the incident and that was why it was important for the police to talk to him. Defendant answered, "I know." Defendant indicated that he would talk to Cohen but he did not "want to do it here" in Sacramento. Defendant said he would talk to Cohen when he was transferred to Fairfield.

Cohen told defendant that he was concerned that there was a gun somewhere; he did not want someone to get hurt. Defendant remarked that there was not any gun in Sacramento. Cohen asked about the location of the gun defendant used on July 15. Cohen noted that he would try to have defendant moved to Fairfield that night.

Cohen arranged to have defendant transported to Fairfield, and spoke to defendant again after the transfer. This interview was taped and again played for the jury. Another detective was also in the room and defendant asked to speak briefly to Cohen only. The other detective left the room and defendant inquired whether he could talk to Cohen off the record. Cohen emphasized that he was a police officer and that "there's really not much off record with me when it comes to something like this." He elaborated that he would share the report with the district attorney and the information could not be secret. Cohen added that it was his understanding that defendant wanted to have his side of what happened known. Cohen told defendant that his explanation would become part of the official record. He also advised defendant that he would do further investigation if defendant gave him information that was "drastically" different from the information he already had.

Defendant stated that the news in the paper and on the Internet stated that he was wanted for "killing somebody and hanging out in the parking lot waiting for somebody to come out...." He complained that "they already got me guilty." He asked how he could get a "fair fight" since they "painted" him "like a monster." Defendant remarked that he did not have an attorney and did not know how much to say. He did not know what information would hurt him and what would help him. He asked if he could have somebody there with him. When Cohen asked whether he was asking for a lawyer, defendant answered, "Yeah." Cohen explained that he did not have lawyer to assign to him at that point and that would be done after he was booked and had his first court appearance.

Defendant stated that he wanted to ask Cohen simple questions off the record and advised Cohen that Cohen could give defendant an affirmative or negative response. Defendant asked whether his arrest warrant was for murder; Cohen told him that it was. Defendant asked whether it could be "just manslaughter." Defendant added: "If I say, 'woo' ... and we go through all the things and you talk to whoever you need to talk to whoever I need to talk to and you take to who is the [district attorney] and maybe we can work something with that. That's what I mean you know like, you feel me? If you know what I'm saying, if my story get out, the whole truth you know what I'm saying and then investigate with what you heard or what not and you pretty much the [district attorney] can just see and maybe it could be that." Cohen responded, "Okay."

**The Defense**

**Defendant's Testimony**

Defendant was 36 years old at the time of trial. He was convicted of robbery when he was 18 years old and did not use a gun during the

robbery. In 1994, at the age of 20, he was convicted of a felony involving the unlawful taking of a car.

Defendant stated that he met Permenter at a Motel 6 in Fairfield in the middle of the month of February 2007. Initially they were simply friends but after about two months they began a sexual relationship.

Permenter told defendant that she was a prostitute and that Thompson was her pimp. She showed defendant a listing on Craig's list. Defendant denied ever being Permenter's pimp and claimed that he never posted any ads for her. He saw other women while dating Permenter.

Permenter disclosed to defendant that Thompson did not treat her well and that she was afraid of him. She related an incident where Thompson put a gun to her head and told her he would kill her if she tried to leave him. She also stated that Thompson's friends robbed her at a motel and she believed Thompson "was behind it." Defendant also heard from an acquaintance that Thompson always carried a gun, was quick to pull it out, and was a bully "looking for stuff to get into." He also heard that Thompson had pistol whipped a person because he owed Thompson money. He also was told that Thompson had raped a woman.

Defendant did not personally know Thompson but knew people who had heard of him. He spoke with Thompson twice on the telephone and Thompson said, "I'm Pretty Boy." Defendant spoke to Thompson because Thompson would call Permenter 20 to 30 times in a row; he hoped Thompson would stop calling if he heard defendant's voice. Thompson repeatedly said that Permenter was "my bitch" and instructed defendant to stay away from Permenter.

About one month before the shooting, a cousin of defendant's friend reported that Thompson had stated that he would "fuck" defendant up for "messing with" Permenter. Defendant also saw e-mails sent to Permenter showing Thompson holding a firearm pointed at the camera. Defendant considered these photographs to be threats that Thompson would use a gun on him.

Defendant had a gun in July 2007 for protection. It was not his own gun but belonged to his friend. Defendant stated that he had been robbed in Oakland and a person had pulled a gun on him in Fairfield. He denied that he had a gun because he was selling drugs or pimping. Defendant admitted that his cursor on his "My Space" page had a pistol as the cursor and a click brought up a gun scope. He also acknowledged that the background on his My Space page consisted of marijuana leaves.

On July 14, 2007, Permenter called defendant and invited him to come to her new apartment. He went over to her place after 10:00 p.m. They fell asleep about 12:00 or 12:30 a.m.

Defendant testified that he awoke because of loud knocking at the door. He roused Permenter and asked her to see who was at the door. He heard her speaking from inside the apartment to Thompson, who

7

was outside the door. He joined Permenter at the door and noticed that Permenter was speaking to Thompson on the phone. Thompson told Permenter to come outside. Permenter repeatedly told Thompson to leave. The exchange at the door lasted about three minutes and then it became quiet; Permenter hung up the phone. Permenter and defendant looked out the window; they did not see Thompson.

Defendant decided to go outside to look around to see if Thompson had left. He did not bring his gun with him and did not intend to confront Thompson. He saw Pickett and asked him if he saw anybody. He walked to the parking lot and then returned to the apartment. He denied that he left for a short time in his car.

When he returned to the apartment, Permenter played the voicemails from Thompson. Thompson told Permenter to pick up the phone. Other messages told her that he was right outside and that she should come outside or answer the phone. Other messages stated that he knew she had someone there. One message indicated that he was coming back. Permenter's phone continued to ring but she did not answer it.

Permenter informed defendant that Thompson had given her money so she could lease the apartment and was "just trying to start shit." Defendant retrieved his gun from the dresser and intended to return to Richmond. Permenter, according to defendant, asked him not to leave.

Defendant continued to look out the window when he saw the lights of a car go out and heard a car door slam shut. Defendant saw Thompson; Thompson was yelling toward the apartment. Defendant could not hear what Thompson was saying. Defendant noticed that Thompson had his hand in his pocket and it looked as if he might have something. Permenter said: "What is he doing? He got a gun."

Defendant opened the door, stood in the doorway, and asked Thompson what the problem was. Defendant wanted to calm Thompson down. Permenter instructed him not to worry about Thompson because he was just trying to cause problems. She grabbed defendant's arm and told him not to go outside.

Defendant went down the stairs and defendant could see the outline of a gun in Thompson's pocket. Thompson came toward him. They met close to the stairs, by the bushes, and were about 10 feet apart.

Defendant asked Thompson why he had his hand in his pocket and Thompson did not answer. Thomson asked him what he had to say about their "playing" him and kept say, "that bitch this, that bitch that." Defendant told Thompson that the police were going to come because of the noise. Defendant was wary of Thompson because he believed he had a gun, but he claimed that he was not upset with him. He believed that they could come to a calm solution.

Thompson pulled the gun out of his front jacket pocket when he was about four feet away from defendant. He told defendant that he "got

8

my strap." He pointed the gun at defendant. Defendant started backing up until he bumped into the stairway railing. He asked Thompson why he had his gun out and Thompson said that he could kill him "and that bitch." Thompson put the gun in defendant's face, with his finger on the trigger and the hammer cocked.

Defendant was scared and thought he was going to die. Defendant turned sideways and backed away; he pulled his own gun from his back right pocket and started shooting. Thompson never fired his gun. Thompson fell back into the bush and defendant asserted that he did not fire any more shots. He claimed that he never intended to kill Thompson. He denied standing over Thompson and shooting at him.

Thompson started getting up from the bush and defendant saw the gun on the ground. Defendant picked up Thompson's gun while Thompson ran up the stairs to Permenter's door. Defendant was stunned and stood there for a minute. He went to his car but realized he did not have his key. He put both guns in his pockets and ran upstairs.

Defendant spotted Thompson sitting with his back to the wall next to the door of Permenter's apartment. Defendant pounded on the door and told Permenter to open it because he needed his keys. Permenter opened the door, shoved his keys at him, and slammed the door shut. He ran downstairs and left. He did not tell anyone that someone had tried to kill him. He said nothing more to Permenter and had no further contact with her.

Defendant drove to the home of his daughter's mother and got a plastic Target bag. He wiped off the handle of Thompson's gun where he had touched it and took out the magazine. He put the magazine and gun in the bag. Defendant buried Thompson's gun but later retrieved it and put the bag under the seat of the car. He buried the gun that he used. He asserted that he was not thinking rationally.

Defendant went to Sacramento the next day and stayed at an apartment belonging to his cousin's friend. He remained in the apartment until his arrest because he knew from the newspaper that he was wanted for murder.

Defendant stated that he received legal advice on the phone from a lawyer at a legal group in Southern California before his arrest. He did not remember the lawyer's name or the group's name. Without disclosing details, defendant told the attorney that he had shot Thompson in self-defense. The lawyer told him that self-defense was "legal" but that he would probably face a charge of murder and a jury trial. Defendant claimed that when he was talking to Cohen and said, "Maybe it could just be that," he was referring to self-defense, not manslaughter.

Defendant admitted that he did not tell Cohen that Thompson had threatened him. He also did not mention that his gun was buried.

Defendant testified that after he told Cohen he wanted an attorney, Cohen tried "to get in contact with an attorney that" he had before.

Defendant reported that his attorney "actually called ... one of the detectives back" and they gave him a cell phone and he talked to the attorney. Defendant reported that he did not tell Cohen his "story" because his attorney advised him not to answer any questions.

**Physical Evidence**

Richelle Neverson, senior forensic scientist for Technical Associates was retained by the defense to do DNA testing on the gun and magazine recovered from the rental car. Neverson was unable to obtain sufficient DNA in one swab and had to combine swabs from different parts of the gun into one sample and all the swabs from the magazine into another sample.

Neverson was unable to exclude either defendant or Thompson as being potential donors to the profile from the gun. Thompson's DNA matched the combined sample at seven of the nine loci, and defendant's DNA matched it at five loci. There was a chance of 1 in 4,550 that an African–American other than Thompson contributed to the combined sample, which was a 99.97 percent exclusion rate. There was a chance of 1 in 589 that an African–American other than defendant contributed to the combined sample for a 99.83 percent exclusion rate.

Jacobus Swanepoel, a criminalist with Forensic Analytical Sciences, was hired by the defense as a consultant. He stated that he was unable to determine the position of the shooter or the decedent and that the evidence showed only the general area where the firearm was discharged. The general area was in front of the stairs leading up to the apartment. The location of the casings was not inconsistent with the testimony of any of the witnesses. The casings were also not inconsistent with the autopsy. The physical evidence, however, was insufficient for him to determine whether the witnesses' statements were correct.

**Evidence of Thompson's Violent Character**

Katrina Lanae Beckman, who was 24 years old at the time of the trial, testified that she lived with Thompson as his girlfriend off and on for about six months. They broke up five days before he was killed. She was a prostitute but was not working for him. Thompson had slapped her once but this was the only time he was violent with her. She did not believe Thompson was a violent person and never saw him with a gun.

Demetria Adams, a defense investigator interviewed Beckman before trial. Beckman had informed the investigator that she worked for Thompson as a prostitute. Beckman told the investigator that she had separated from Thompson because of the physical abuse. When confronted with a diary entry indicating that she was punished by someone for not following the rules, which resulted in her receiving two black eyes, Beckman told the investigator that Thompson was the person who did this to her. She also disclosed that she never saw Thompson with a gun and had not known him to carry one.

10

1
2

Permenter admitted that Thompson had pulled a gun on her in his home a few months before the shooting. Thompson told her that the gun was not loaded and he did not do it again.

3
4

The court also admitted documentary evidence that Thompson had a conviction for being an ex-felon in possession of a firearm.

5

**Rebuttal**

6
7
8

Detective Shaffer testified that there were four manufacturers of the type of weapon used to kill Thompson. He stated that if a person fired the gun with his back to the staircase railing, as defendant said he did, the casings would have been in the stairwell or near the foot of the staircase.

9

People v. Jackson, No. A132659, 2013 WL 3039798, at **2-9 (Cal. Ct. App. June 19, 2013).

10

## II.     Procedural Background

11

### A.  Judgment and Sentencing

12

On August 26, 2010, the jury acquitted petitioner of first degree murder and found him

13

guilty of second degree murder.  Petitioner was sentenced to a term of 30 years to life with a 25-

14

years-to-life firearm enhancement.  Jackson, 2013 WL 3039798, at *9.

15

### B.  State Appeal, State Habeas, and Federal Proceedings

16

Petitioner was appointed counsel for his appeal.  Counsel raised the following claims:  (1)

17

the exclusion of evidence of the victim's violent conduct violated petitioner's due process rights;

18

(2) the exclusion of testimony regarding the victim's past crimes violated due process; and (3)

19

trial court error in admitting expert testimony from a detective regarding  the location of the

20

expended cartridges.  (ECF No. 55-17 at 2-60.)  Subsequently, the court granted petitioner's pro

21

se request to file a supplemental brief.  In that supplemental brief, petitioner claimed: (1) juror

22

misconduct; (2) prosecutorial misconduct; and (3) admission of his statements to the police after

23

he invoked his right to counsel violated his Miranda rights.  Petitioner requested that the appellate

24

court modify his conviction to manslaughter.[2]  (Id. at 166-236.)

25

Respondent filed responsive briefs to both the appellate brief (ECF No. 55-17 at 62-150)

26

and supplemental brief (id. at 238-283).  Petitioner's appointed counsel filed a reply brief

27
28

---

[2]  As discussed in more detail below, at a later state court hearing, petitioner's trial attorney, Meenha Lee, testified that she prepared this supplemental brief.

1    regarding the claims he raised on appeal.  (Id. at 152-164.)  Petitioner did not file a supplemental

2    reply brief.

3         Petitioner, through his trial attorney, also filed a state habeas petition in the Court of

4    Appeal on March 20, 2013 regarding his juror misconduct claim.  (ECF No. 55-18 at 2-14.)

5    Respondent filed a letter brief in response.  (Id. at 16-22.)  Petitioner did not file a reply.  On June

6    19, 2013, the Court of Appeal denied the petition without comment.  (Id. at 24.)

7         With respect to petitioner's appeal, the California Court of Appeal for the First Appellate

8    District addressed the claims in both the appellate opening brief and supplemental brief and

9    affirmed the judgment in June 2013.  People v. Jackson, No. A132659, 2013 WL 3039798, at

10   **2-9 (Cal. Ct. App. June 19, 2013).

11        Petitioner, through his appointed appellate counsel, filed a petition for review in the

12   California Supreme Court on August 1, 2013.  (ECF No. 55-22 at 3-25.)  He raised the first two

13   claims asserted in his appellate opening brief.  On September 12, 2013, the California Supreme

14   Court denied review without comment.  (Id. at 2.)

15        When he filed his original petition in this court in 2014, petitioner was represented by

16   attorney Joel Chan.  (ECF No. 1-1.)  On August 30, 2015, Chan moved to withdraw as

17   petitioner's counsel.  (ECF No. 23.)  The court granted that motion and appointed new counsel for

18   petitioner.  (ECF Nos. 26, 28.)

19        Petitioner filed a second state habeas petition in 2016 in the Solano County Superior

20   Court.  Therein, he raised four claims:  (1) the trial court wrongly denied his motion to exclude

21   statements he gave to police investigators after invoking his right to counsel; (2) the trial court

22   wrongly decided petitioner's motion to exclude references to his post-Miranda silence and the

23   prosecutor's references to that silence violated due process; (3) his trial attorney was

24   constitutionally ineffective when she failed to negotiate a plea bargain because she had become

25   emotionally involved with petitioner; and (4) appellate counsel was ineffective when he failed to

26   raise the first three claims.  (See ECF No. 55-26 at 5-56.)  After noting that petitioner had already

27   raised the first two claims in his supplemental brief on appeal, the superior court ordered an

28   evidentiary hearing on the third issue.  (ECF Nos. 55-23, 55-24.)  After the hearing, the superior

1   court denied petitioner's ineffective assistance of trial counsel claim.  (ECF No. 55-25.)

2   Petitioner then filed a petition in the California Supreme Court reiterating his four claims.  (ECF

3   No. 55-26 at 4-56.)  On August 30, 2017, that court denied the petition without comment.  (Id. at

4   2.)

5          Petitioner filed a first amended petition ("FAP") in this court on December 3, 2017.  (ECF

6   No. 46.)  Therein, petitioner alleges the following claims:

7          (1) Petitioner's Miranda rights were violated when the trial court admitted evidence of a

8   statement petitioner made after he asked for an attorney and when the prosecutor commented on

9   petitioner's post-Miranda silence.  Petitioner further alleges his trial counsel was ineffective for

10  failing to object to the prosecutor's comments.

11         (2) Petitioner's appellate counsel was ineffective for failing to raise the issues in claim 1.

12         (3) Petitioner's trial attorney was constitutionally ineffective in plea negotiations.

13         (4) Petitioner's due process rights were violated by the exclusion of testimony concerning

14  the victim's violent past.

15         Petitioner further argues that he is entitled to equitable tolling of the statute of limitations.

16         In the answer, respondent opposes petitioner's claims on the merits but does not assert a

17  statute of limitations defense.  (ECF No. 54.)  On October 29, 2018, petitioner filed a traverse.

18  (ECF No. 58.)

19              **STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

20         An application for a writ of habeas corpus by a person in custody under a judgment of a

21  state court can be granted only for violations of the Constitution or laws of the United States.  28

22  U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or

23  application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502

24  U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

25         Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

26  corpus relief:

27              An application for a writ of habeas corpus on behalf of a person in
                custody pursuant to the judgment of a State court shall not be granted
28

13

with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time the state court adjudicated the claim on the merits.  Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'"  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct."  Id. at 1451.  Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue.  Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-06).  "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.'"  Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  "[A]

14

1    federal habeas court may not issue the writ simply because that court concludes in its independent

2    judgment that the relevant state-court decision applied clearly established federal law erroneously

3    or incorrectly.  Rather, that application must also be unreasonable." <u>Williams</u>, 529 U.S. at 411;

4    <u>see also</u> <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Andrade</u>, 538 U.S. at 75 ("It is not

5    enough that a federal habeas court, in its independent review of the legal question, is left with a

6    firm conviction that the state court was erroneous." (Internal citations and quotation marks

7    omitted.)).  "A state court's determination that a claim lacks merit precludes federal habeas relief

8    so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

9    <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652,

10   664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a

11   state prisoner must show that the state court's ruling on the claim being presented in federal court

12   was so lacking in justification that there was an error well understood and comprehended in

13   existing law beyond any possibility for fairminded disagreement."  <u>Richter</u>, 562 U.S. at 103.

14          There are two ways a petitioner may satisfy subsection (d)(2).  <u>Hibbler v. Benedetti</u>, 693

15   F.3d 1140, 1146 (9th Cir. 2012).  He may show the state court's findings of fact "were not

16   supported by substantial evidence in the state court record" or he may "challenge the fact-finding

17   process itself on the ground it was deficient in some material way."  <u>Id.</u> (citing <u>Taylor v. Maddox</u>,

18   366 F.3d 992, 999-1001 (9th Cir. 2004)); <u>see also</u> <u>Hurles v. Ryan</u>, 752 F.3d 768, 790-91 (9th Cir.

19   2014) (If a state court makes factual findings without an opportunity for the petitioner to present

20   evidence, the fact-finding process may be deficient and the state court opinion may not be entitled

21   to deference.). Under the "substantial evidence" test, the court asks whether "an appellate panel,

22   applying the normal standards of appellate review," could reasonably conclude that the finding is

23   supported by the record.  <u>Hibbler</u>, 693 F.3d at 1146 (9th Cir. 2012).

24          The second test, whether the state court's fact-finding process is insufficient, requires the

25   federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-

26   finding process] is pointed out would be unreasonable in holding that the state court's fact-finding

27   process was adequate."  <u>Hibbler</u>, 693 F.3d at 1146-47 (quoting <u>Lambert v. Blodgett</u>, 393 F.3d

28   943, 972 (9th Cir. 2004)).  The state court's failure to hold an evidentiary hearing does not

1    automatically render its fact finding process unreasonable.  Id. at 1147.  Further, a state court may

2    make factual findings without an evidentiary hearing if "the record conclusively establishes a fact

3    or where petitioner's factual allegations are entirely without credibility."  Perez v. Rosario, 459

4    F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

5            If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews

6    the merits of the claim de novo.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see

7    also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we

8    may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error,

9    we must decide the habeas petition by considering de novo the constitutional issues raised.").  For

10   the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of

11   28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the]

12   claim in State court proceedings" and by meeting the federal case law standards for the

13   presentation of evidence in a federal habeas proceeding.  See Cullen v. Pinholster, 563 U.S. 170,

14   186 (2011).

15          The court looks to the last reasoned state court decision as the basis for the state court

16   judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

17   "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from

18   a previous state court decision, [this court] may consider both decisions to 'fully ascertain the

19   reasoning of the last decision.'"  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

20   banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)).  "When a federal claim

21   has been presented to a state court and the state court has denied relief, it may be presumed that

22   the state court adjudicated the claim on the merits in the absence of any indication or state-law

23   procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption may be

24   overcome by showing "there is reason to think some other explanation for the state court's

25   decision is more likely."  Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

26   Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

27   expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

28   the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289, 293 (2013).

16

1    When it is clear that a state court has not reached the merits of a petitioner's claim, the deferential

2    standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review

3    the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir.

4    2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

5                                          **ANALYSIS**

6    **I.      Claim 1 – Violations of <u>Miranda</u> and <u>Doyle</u>**

7         Petitioner makes three arguments in claim 1.  First, he contends that his rights under

8    Miranda v. Arizona and Edwards v. Arizona were violated because the prosecution was permitted

9    to introduce a statement petitioner made after he invoked his right to counsel.  Second, petitioner

10   argues that the prosecutor's questions and argument regarding petitioner's post-Miranda silence

11   violated his due process rights under Doyle v. Ohio.  Third, petitioner alleges he was deprived of

12   the constitutionally effective assistance of counsel when his trial attorney failed to object to these

13   errors and failed to request a curative instruction.

14   **A. Background**

15       **1. Post-arrest Interrogation**

16       The post-arrest interrogation of petitioner is described by the California Court of Appeal

17   in detail above and will not be repeated in full here.  In summary, petitioner was given Miranda

18   warnings immediately after his arrest.  He agreed to talk with Detective Cohen of the Fairfield

19   Police Department.  Initially, petitioner told Cohen that the media had "twisted" the story and no

20   one knew his "side" of the story.  Cohen repeatedly asked petitioner for his side of the story and

21   petitioner repeatedly declined to respond to those questions.  Petitioner was then moved to

22   Fairfield where Cohen continued to question him.  At one point, the following exchange took

23   place:

24           A:     I'm saying like I don't want to *you know I don't have a lawyer*
                    *right now you know what I'm saying.*

25           Q:     Yeah.

26           A:     And *I don't know how much to go about saying*, you feel me
                    that can ...

27           

28           Q:     Okay .

                                             17

A:      ...it may help me, it may hurt me, you know what I'm saying but I don't know . I don't have nobody in my ear like you know I'm saying or have nobody that be like well he - he want you know what I'm saying, he want to know this and this you know that's what I mean *can I get somebody right here with me*. And we can just talk it out or whatever you know what I'm saying.

Q:      *A lawyer?*

A:      *Yeah.*

Q:      Well, you remember when I read you your rights, and one of your rights was that if you have a lawyer you have to right to have a lawyer present you wish to have one?

A:      Yeah .

Q:      Okay. Do I have a lawyer right here to give to you to assign to you[?] I don't. Once you get booked and once you go to your first court appearance the judge will ask you if you have a lawyer. If you haven't arranged for one once you got booked.

A:      Mm-hm.

Q:      ... and then if you haven't gotten one and you don't have a way to pay for one, then he'll say okay I'm going to assign so and so to be your lawyer. Then you'll have an attorney for you.

A:      That's what I just wanted to ask you like a simple like couple of questions off the record so I can get like yay or nay or you know what…whether you know what I'm saying whether it's a possibility you might not be able to say yay/nay right now but maybe I can check into that you know what I'm saying ...

Q:      Yeah.

A:      You know that way I can be like you what I need to go about doing because like I said I'm painted as you know what I'm saying like I need and you know and it's like how it's appearing. Maybe you -- I'm pretty sure you have heard a couple of people 's stories I don't know if they're lying or if it is the truth. I don't know because it seems like it's the truth, they didn't really tell the truth or yall not just really putting that truth out there, you know what I'm saying.

Q:      Well, like I said I don't have control over what the media says, media like TV, newspapers and stuff. They get some of the information from us and sometimes they do their own questioning. They talk to neighbors they talk to whoever might be standing around and says that they have something to add and sometimes they put stuff in there that isn't what we believe to be facts of the case. The media does that sometimes.  We have no control over what they do.

A:      Okay, so just say hypothetically speaking I had my representation right here ...

18

Q:      Yes.

A:      ... and he you know anything and he tell you what happen and I'm pretty sure that it'll be - it wouldn't be .. What am I wanted for? Murder? First Degree-Whatever.  What do I got a warrant for?

Q:      It's murder.

A:      You know what I'm saying.

Q:      Yeah.

A:      It could - *what if it's just manslaughter though*.  Can we just like you know what I'm saying you feel me?

Q:      Yeah .

A:      If l say, "woo" .. and we go through all the thing s and you talk to whoever you need to talk to whoever I need to talk to and you take to who is the DA and maybe we can work something with that. That' s what I mean you know like, you feel me? If you know what I'm saying, if my story get out, the whole truth you know what I'm saying and then investigate with what you heard or what not and you pretty much the DA can just see and maybe it could be that.

Q:      Okay .

(Ex. M to FAP (ECF No. 46-5 at 363-64) (emphasis added).)

The transcript of the interview ends at this point.  Petitioner testified that Cohen tried to contact an attorney "that I had before.  So that's what we were trying to do."  (RT 708 (ECF No. 55-12).).  Petitioner testified further that his attorney "actually called . . . one of the detectives back . . . and they gave me the cell phone and I talked with him."  (Id.)  On redirect, petitioner said he failed to tell Cohen his story because he did not want to do so until he had talked to a lawyer and when, when he did talk with the lawyer, the lawyer told him "to answer no questions." (RT 868 (ECF No. 55-12).)

## 2.   Pretrial Motion to Exclude

Petitioner filed a motion to exclude any mention of his invocation of the right to counsel, statements made after he invoked his right to counsel, or of his post-Miranda silence.  He contended that Detective Cohen violated his rights under Miranda v. Arizona and Edwards v. Arizona when he continued to question petitioner after petitioner invoked his right to counsel. (CT 310-16  (ECF No. 55-2).)  The trial judge concluded that during the first interview with

19

1   petitioner in Sacramento, petitioner did not make an unambiguous request for counsel or indicate

2   he wished to invoke his right to remain silent.  Therefore, statements petitioner made during that

3   interview were not barred by <u>Miranda</u> or <u>Edwards</u>.  (RT 143 (ECF No. 55-10).)

4          With respect to the second interview in Fairfield, the judge concluded that prior to

5   "invoke[ing] his right to counsel," petitioner did not indicate he was invoking his right to be silent

6   and therefore those statements would be admissible.  (RT 143-44 (ECF No. 55-10).)  The judge

7   first stated that he was taking the issue of petitioner's statements made after he invoked the right

8   to counsel under submission so that he could review the videotape of that part of the

9   interrogation.  (<u>Id.</u> at 144-45.)  The statement at issue was "what if it's just manslaughter though."

10  However, the judge then informed counsel that "at this point, unless I change my ruling between

11  now and opening statements, that statement is excluded, subject to me revisiting the issue, and the

12  People are not to refer to it in their opening statement."  (<u>Id.</u> at 146.)

13         The following day, the judge informed counsel that he had reviewed the videotape of the

14  Fairfield interrogation and reviewed the transcripts again.  He mentioned having also reviewed

15  case law, including the <u>Edwards</u> case.  (RT 176-77 (ECF No. 55-10).)  The judge reversed his

16  earlier ruling.  He held that petitioner did not invoke his right to counsel.  He further held that

17  petitioner's statement "what if it's manslaughter" was not made in response to a question.  Rather,

18  petitioner initiated the statement.  (<u>Id.</u> at 178-79.)

19         The parties then discussed whether the prosecution could refer to petitioner's failure to

20  "tell his side of the story."  The judge expressed uncertainty about that issue and informed the

21  prosecutor that she could not argue or allude to petitioner's failure to explain in her opening

22  statement.  He stated that he would look into the issue further.  (RT 181-82 (ECF No. 55-10).)

23         During trial, the judge ruled that the prosecutor could question Detective Cohen about

24  petitioner's explanation or lack of one, but could not question him about petitioner's failure to say

25  he had acted in self-defense.  (RT 537-39 (ECF No. 55-11).)  The basis for the judge's ruling

26  appeared to be that because petitioner had not yet testified, the issue of self-defense was not yet

27  before the jury.  When asked specifically by defense counsel whether the prosecutor could argue

28  about petitioner's failure to tell Cohen he acted in self-defense, the judge first stated that he did

20

1   not "necessarily disagree with you, but we're not at the final argument stage." (RT 541.)

2   However, the judge went on to note that "this defendant was not silent.  He did not invoke his

3   right to remain silent.  He agreed to talk and several times said he would talk." (RT 541-42.)  The

4   judge then made clear that the issue of what the prosecutor could, or could not, argue was not yet

5   ripe.  (RT 542.)

6         When petitioner testified, the prosecutor asked him numerous questions on cross-

7   examination about the fact he never told Cohen the victim had threatened him (RT 847, 850-51,

8   854, 855 (ECF No. 55-12)), never told Cohen he shot the victim in self-defense (RT 854, 855,

9   864 (ECF No. 55-12)), and never told Cohen his "side of the story" (RT 858-59 (ECF No. 55-

10  12)).  It does not appear that defense counsel objected to these questions on the grounds that the

11  prosecutor was eliciting evidence about petitioner's silence.  And, defense counsel did not raise

12  that objection later prior to closing argument.  In her closing argument, one of the points the

13  prosecutor stressed was petitioner's post-Miranda silence.  (RT 1244-48, 1319 (ECF No. 55-14).)

14  Again, petitioner's trial attorney did not object.  Therefore, the trial court did not make a final

15  ruling on that issue.

16      **B.   Challenge to Trial Court's Denial of Motion to Exclude Manslaughter Statement**

17         Petitioner argues that he invoked his right to counsel during the interrogation by Detective

18  Cohen and any subsequent statements he made should have been excluded.

19           **1.   State Appellate Court Decision**

20         The state Court of Appeal did not determine whether the use of petitioner's "what if it's

21  manslaughter" statement at trial violated his rights under Miranda and Edwards.  Rather, the court

22  found that even if admission of the statement was error, that error was harmless beyond a

23  reasonable doubt.

> Even if we were to presume that defendant's request for an attorney
> was clear and that the court erred in permitting the jury to hear
> defendant's statements following his request for an attorney, we
> conclude that any such error was clearly harmless beyond a
> reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.) We will not
> reverse when the court commits federal constitutional error when
> admitting the defendant's statements if we conclude that the error was
> harmless beyond a reasonable doubt. (*See, e.g., People v. Talley*
> (1967) 65 Cal.2d 830, 840.)

21

The statements at issue involved defendant's asking whether his arrest was for murder and whether it could simply be manslaughter. He also indicated that he wanted to find out if something could be worked out with the district attorney.

The foregoing statements were harmless beyond a reasonable doubt. Defendant in his testimony admitted that he shot the victim. The only other relevant information contained in these statements was that he was interested in a plea bargain and his failure to claim that his actions were in self-defense. The fact that defendant was interested in a plea bargain was not prejudicial because defendant had previously told the detective, after he had waived his *Miranda* rights and before he asked for an attorney, that he believed the news coverage made it impossible for him to receive a fair trial. Similarly, defendant never mentioned self-defense to the detective prior to his asking for an attorney and after he waived his *Miranda* rights. Moreover, the record showed that defendant never mentioned self-defense to Permenter immediately after he shot the victim.

. . .

We conclude that defendant's statements after he requested an attorney did not provide the jury with any new information and the record would not have been significantly different had the trial court ruled that these statements were inadmissible. Accordingly, we conclude any alleged error was harmless under *Chapman*, *supra*, 386 U.S. at page 24.

Jackson, 2013 WL 30339798, at **22-23.

### 2.   Legal Standards

The Ninth Circuit recently reiterated the rule at issue here:

Under *Miranda*, custodial interrogation of a defendant must be preceded by the advice that he has the rights, among others, to remain silent and to have an attorney present. If a defendant requests counsel, "the interrogation must cease until an attorney is present." 384 U.S. at 474, 86 S.Ct. 1602. If a defendant invokes his right to counsel, a subsequent waiver must be voluntary, knowing, and intelligent. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). It is insufficient to show "only that [the defendant] responded to further police-initiated custodial interrogation" to establish a waiver of counsel. *Id.* at 484, 101 S.Ct. 1880. Once a defendant requests counsel, he should not be subject to further interrogation "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. 1880. Thus, *Edwards* established a "prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990).

Bradford v. Davis, 923 F.3d 599, 615 (9th Cir. 2019).  The court noted that a voluntary statement

1   obtained in violation of <u>Miranda</u> would nonetheless be admissible if its "'trustworthiness . . .

2   satisfies legal standards.'"  <u>Id.</u> (quoting <u>Mincey v. Arizona</u>, 437 U.S. 385, 397-98 (1978)).

### 3.  Was the State Court's Opinion on the <u>Miranda</u> issue Contrary to, or an Unreasonable Application of, Clearly Established Federal Law?

The Court of Appeal found that even if the use of petitioner's "what if it's manslaughter"

statement violated his <u>Miranda</u> rights, any error was harmless.  This court agrees.

Prior to asking for counsel, petitioner told Detective Cohen that he was concerned about

the media reports which were "twist[ing] it up" and that he was pretty sure "she," presumably

meaning Permenter, had told officers "everything."  (ECF No. 46-5 at 344-45.)  When Cohen

pressed for petitioner's story, petitioner told him he would talk to him, but "I just don't want to do

it here."  (<u>Id.</u> at 346.)  Petitioner said he would talk with Cohen when they got to Fairfield.  (<u>Id.</u> at

348.)

In Fairfield, petitioner continued to refuse to tell his side of the story.  However, he

complained about the media portrayal of what happened and being "painted like a monster."

(ECF No. 46-5 at 361-62.)  He was concerned that he would not get a fair trial because "[t]hey

already got me guilty."  (<u>Id.</u>)  He also told Cohen he was afraid to talk with him because he did

not know how what he said might be used against him later.  (<u>Id.</u>)

Petitioner's statements to Cohen made clear he was involved in the shooting.  Further, he

testified to just that.  He did not deny shooting the victim.  The statement that petitioner now

challenges occurred after he asked Cohen what he was wanted for.  Cohen responded "[i]t's

murder." (ECF No. 46-5 at 364.)  Petitioner stated, "what if it's just manslaughter though."  (<u>Id.</u>)

He then indicated he was interested in pursuing a plea agreement with the district attorney.  (<u>Id.</u>)

Petitioner expressed his fear numerous times that he had already been found guilty of

murder by the media and stated that he could not get a fair trial.  Petitioner did not deny that he

shot the victim, the issue was how that happened.  In light of petitioner's statements and the fact

he did not contest the fact he shot the victim, jurors would hardly have been surprised that

petitioner wanted to talk with the district attorney.

1    This court finds no error, much less unreasonable error, in the Court of Appeal's analysis

2    of the harmlessness of these statements.[3]  Accordingly, petitioner's claim should fail under 28

3    U.S.C. § 2254(d)(1) because he has not established the state court decision was contrary to or an

4    unreasonable application of clearly established federal law.

5                    **C.  Evidence and Argument re Petitioner's Silence**

6    Petitioner argues that the prosecutor committed misconduct when she repeatedly asked

7    petitioner whether he had mentioned to Detective Cohen that he felt threatened by the victim or

8    that he shot the victim in self-defense.  In addition, in closing argument, the prosecutor argued

9    that any reasonable person would have told Cohen he acted in self-defense.  She stressed that

10   petitioner's failure to tell Cohen indicated petitioner needed more time to "make up" his self-

11   defense story.  Petitioner contends the prosecutor's questions and argument violated his Fifth

12   Amendment right to remain silent and his due process right to a fair trial.

13                    **1.  Decision of the State Court**

14   This court must first determine the relevant decision of the state court.  To exhaust his

15   claims, petitioner must have raised them before the state's highest court.  Therefore, this court

16   looks to the California Supreme Court's decision on the issue.  Where the California Supreme

17   Court has not explained its decision, this court looks through that decision to the last reasoned

18   decision of the state court.

19   Petitioner raised this issue in his appeal to the California Court of Appeal.  (ECF No. 55-

20   17 at 196-98.)  On appeal, the Court of Appeal summarily denied petitioner's claim of

21   prosecutorial misconduct by finding that the prosecutor did not, in fact, comment on petitioner's

22   silence.  Jackson, 2013 WL 3039798, at *23.  He did not, however, raise it again in his petition

23   for review to the California Supreme Court.  (ECF No. 55-22 at 5-6.)  Rather, petitioner raised the

24   claim in his 2016 habeas corpus petition in the California Supreme Court, which was summarily

25   denied.  (ECF No. 55-26 at 5.)  Looking through that summary denial to the superior court's

26   _____

27   [3] To the extent petitioner is arguing that the trial court erred in admitting the manslaughter
     statement as inconsistent with petitioner's trial testimony, that argument fails as well for the same
28   reason.  Any error was harmless.

                                           24

1   opinion, that court held that the issue had already been raised, and decided, by the Court of

2   Appeal in petitioner's appeal.  Accordingly, this court finds the last reasoned decision of a state

3   court was the California Court of Appeal's decision in which it held:

> Defendant also claims that the statements should have been excluded
> because the prosecution improperly commented on his silence in
> closing argument when stressing that he never mentioned self-
> defense. Defendant's argument lacks merit. The prosecution was not
> commending [sic] on defendant's silence. Indeed, defendant did not
> remain silent. Rather, the prosecution noted that in all of defendant's
> comments to the detective and others he never claimed that he acted
> in self-defense.

9   Jackson, 2013 WL 3039798, at *23.

10          **2.   Legal Standards**

11          It is well established that when a suspect asserts his Fifth Amendment right to remain

12  silent, questioning must cease.  Miranda v. Arizona, 384 U.S. 436, 473-74 (1966).  It is also well

13  established that at trial a prosecutor may not comment on the defendant's silence at the time of

14  arrest.  Doyle v. Ohio, 426 U.S. 610, 619 (1976).  In Doyle, the Court considered "whether a

15  prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by

16  cross-examining the defendant about his failure to have told the story after receiving *Miranda*

17  warnings."  Id. at 611.  The Court held that the prosecutor may not do so.  The Court noted that

18  the Miranda warnings informed a suspect that what they said may be used against them at trial.

19  However, the warnings did not inform the suspect that their silence could be used against them.

20  Id. at 617-19.  It would, thus, "be fundamentally unfair and a deprivation of due process to allow

21  the arrested person's silence to be used to impeach an explanation subsequently offered at trial."

22  Id. at 618.

23          The Court later stressed that Doyle protected only the use of a defendant's silence.  Doyle

24  does not bar a prosecutor's questions regarding prior inconsistent statements made during an

25  interrogation.  Anderson v. Charles, 447 U.S. 404 (1980).  The prosecutor's questions in

26  Anderson "were not designed to draw meaning from silence, but to elicit an explanation for a

27  prior inconsistent statement."  Id. at 409.

28  ////

                                        25

1    The Court in <u>Doyle</u> considered a suspect's assertion of his right to remain silent and

2    refusal to respond to any questions.  Here, however, petitioner responded to some, but not all,

3    questions posed to him.  The Ninth Circuit has held that a suspect may invoke a right to remain

4    silent on some issues, but not others.  <u>See</u> <u>United States v. Caruto</u>, 532 F.3d 822, 831 (9th Cir.

5    2008) ("mere omissions are not enough to justify cross-examination or argument regarding what

6    was not said at the time of arrest"); <u>Arnold v. Runnels</u>, 421 F.3d 859, 865 (9th Cir. 2005) (citing

7    <u>United States v. Soliz</u>, 129 F.3d 499, 504 (9th Cir. 1997), <u>overruled on other grounds by</u> <u>United</u>

8    <u>States v. Johnson</u>, 256 F.3d 895 (9th Cir. 2001) (en banc)); <u>see also</u> <u>Hendrix v. Palmer</u>, 893 F.3d

9    906, 927-28 (6th Cir. 2018).

10    In <u>Hurd v. Terhune</u>, 619 F.3d 1080, 1083-84 (9th Cir. 2010), the court considered a

11    defendant's post-<u>Miranda</u> agreement to answer questions but consistent refusal to reenact the

12    shooting at issue.  Throughout the trial, the prosecutor "referred to Hurd's refusal to reenact the

13    shooting as affirmative evidence of his guilt."  619 F.3d at 1084.  The Ninth Circuit concluded

14    that "[a] suspect may remain selectively silent by answering some questions and then refusing to

15    answer others without taking the risk that his silence may be used against him at trial.  <u>Id.</u> at 1087

16    (citing <u>Miranda</u>, 384 U.S. at 473-74).  That selective silence "may not require police to end their

17    interrogation, but it also does not allow prosecutors to use silence as affirmative evidence of guilt

18    at trial."  <u>Id.</u> at 1088.  Silence to a question is ambiguous and "may be no more than a reliance on

19    the right to silence."  <u>Id.</u> (citing <u>Doyle</u>, 426 U.S. at 618-19).

20    The next question in the <u>Doyle</u> analysis is whether the defendant "unambiguously"

21    invoked his right to remain silent.  <u>See</u> <u>Hurd</u>, 619 F.3d at 1088-89 (citing <u>Berghuis v. Thompkins</u>,

22    560 U.S. 370, 381 (2010)).  The court in <u>Hurd</u> considered that requirement in the context of a

23    selective invocation of silence.  In <u>Hurd</u>, when repeatedly asked whether he would reenact the

24    shooting, Hurd consistently stated, "I don't want to do that," "No," and "I don't want to act it out

25    because that – it's not that clear."  <u>Id.</u> at 1089.  The court found these statements were clear

26    invocations of Hurd's right to remain silent regarding a reenactment of the shooting.  <u>Id.</u>  The

27    court in <u>Hurd</u> also noted that the "unambiguous invocation" requirement of <u>Thompkins</u> was

28    meant to provide the interrogator with a clear sign that the suspect was invoking his Fifth

1   Amendment rights and questioning should cease.  Id. at 1088 (citing Thompkins, 560 U.S. at 381-

2   82).  Where the suspect is invoking his rights under Doyle only with respect to his silence in

3   response to certain questions, the invocation of the right to remain silence need not be so clear.

4   As the court recognized in a later case, "a suspect who remains silent in response to certain

5   questions may still claim protection under *Doyle* even if his silence falls short of the unambiguous

6   declaration required to invoke the right to counsel under *Davis* or the right to cut off questioning

7   under *Thompkins*.  United States v. Garcia-Morales, 942 F.3d 474, 476 (9th Cir. 2019) (citing

8   Hurd, 619 F.3d at 1087).

9               **3.   Was the State Court's Decision on the Doyle Claim Contrary to, or an**
                    **Unreasonable Application of, Clearly Established Federal Law?**
10

11                      **a.   Clearly Established Federal Law**

12          The state Court of Appeal simply construed the prosecutor's statements as involving no

13   commentary on petitioner's silence because petitioner was "not silent."  The Court of Appeal

14   conducted no analysis under federal law standards to determine whether or not a suspect could be

15   deemed to assert a Fifth Amendment right not to respond to some questions while agreeing to

16   answer others.  The question, then, is whether the Supreme Court has clearly established that a

17   prosecutor may not comment on a defendant's refusal to answer some questions when he has

18   answered others.  Respondent argues that petitioner fails to show such clearly established

19   Supreme Court law.  In his traverse, petitioner does not identify any.

20          As described above, in Hurd, the Ninth Circuit held that Doyle extends to a suspect's

21   selective invocation of the right to silence.   Moreover, the court further held that the Supreme

22   Court in Doyle and Miranda

23                      clearly established that, after receiving *Miranda* warnings, a suspect
                        may invoke his right to silence at any time during questioning and
24                      that his silence cannot be used against him at trial, even for
                        impeachment. *Miranda* does not apply only to specific subjects or
25                      crimes.  It applies to every question investigators pose.

26   Hurd, 619 F.3d at 1087 (internal citations omitted).  In Hurd, the state court had held that a

27   "defendant has no right to remain silent selectively."  Id. at 1086.  The Ninth Circuit found that

28

                                            27

1    this holding violated the Supreme Court's clearly established law to the contrary.  This court is

2    bound by the Ninth Circuit's holding.[4]

3          The Ninth Circuit determined that the application of <u>Doyle</u> to an invocation of selective

4    silence is "clearly established Federal law, as determined by the Supreme Court." <u>Hurd</u>, 619 F.3d

5    at 1087.  Because the Court of Appeal appeared to assume that the right to silence is an all-or-

6    nothing proposition, it failed to recognize or apply <u>Doyle</u> to petitioner's claim.  Therefore, the

7    court's opinion is contrary to clearly established federal law as decided by the Supreme Court.

8    Accordingly, this court must review that claim de novo.  <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th

9    Cir. 2008) (en banc).

10                          **b.  <u>Doyle</u> Error**

11          It is somewhat difficult to discern just what petitioner is challenging here.  Though it

12    waffled a bit, the trial court did not render a final decision on this issue.  Accordingly, this court

13    _____

14    [4] This court recognizes that two years after the Ninth Circuit decided <u>Hurd</u>, the Third Circuit, noting inconsistency on this issue among the circuits, concluded otherwise:

15          "Not every reference to a defendant's silence, however, results in a
16          *Doyle* violation." [] Here, McBride answered some of the questions
          posed to him subsequent to receiving *Miranda* warnings, but
17          selectively chose not to answer others. Many courts characterize this
          issue as partial or selective silence and have differing views on
18          whether such silence should be admissible at trial against a
          defendant. While we have never considered the issue, some of our
19          sister circuits have held that *Miranda* and *Doyle* protect a defendant's
          partial or selective silence from being used against him at trial.

20    <u>McBride v. Superintendent, SCI Houtzdale</u>, 687 F.3d 92, 104 (3d Cir. 2012) (internal citation
21    omitted).  The court then cited decisions from the Ninth, Tenth, and Seventh Circuits in which
      <u>Doyle</u> was found to protect a defendant's selective silence.  <u>Id.</u> (citing <u>Hurd</u>, 619 F.3d at 1087;
22    <u>United States v. May</u>, 52 F.3d 885, 890 (10th Cir. 1995); and <u>United States v. Scott</u>, 47 F.3d 904,
      907 (7th Cir. 1995)).  This was followed by citations to decisions from the Fifth and Eighth
23    Circuits holding to the contrary.  <u>Id.</u> at 104-105 (citing <u>United States v. Pando Franco</u>, 503 F.3d
      389, 397 (5th Cir. 2007) and <u>United States v. Burns</u>, 276 F.3d 439, 442 (8th Cir. 2002)).  The
24    Third Circuit concluded that "it cannot be said that 'clearly established Federal law, as
25    determined by the Supreme Court of the United States,' 28 U.S.C. § 2254(d)(1), prevents a
      defendant's selective silence from being used against that defendant at trial."  <u>Id.</u> at 105; <u>see also</u>
26    <u>Shultz v. Terry</u>, No. 2:18-cv-0899, 2019 WL 2577970, at *27 (S.D. W. Va. Feb. 8, 2019)
      (collecting cases and concluding that the "circuit courts remain divided over the issue" of
27    "selective silence" which has never been addressed by the Supreme Court; accordingly, there is
      no clearly established federal law on this issue for purposes of review under 28 U.S.C. §
28    2254(d)(1)), <u>rep. and reco. adopted</u>, 2019 WL 1398071 (S.D. W. Va. Mar. 28, 2019).

1   considers petitioner's claim as one of prosecutorial misconduct.  Although, it should be noted that

2   whether due to a decision of the trial court or the conduct of the prosecutor, the analysis under

3   <u>Doyle</u> is the same.  After considering the question of error under <u>Doyle</u>, this court then considers

4   petitioner's claim that his trial attorney was ineffective for failing to object to the questions and

5   argument at trial.

6         Under <u>Doyle</u>, the question is whether petitioner sufficiently invoked his right to silence to

7   Detective Cohen's questions asking for his side of the story.  A suspect need not have uttered a

8   "talismanic phrase" to invoke his right to silence.  <u>Hurd</u>, 619 F.3d at 1089 (citing <u>Arnold</u>, 421

9   F.3d at 866).

10        This court's review of the transcripts of petitioner's Sacramento and Fairfield

11   interrogations show that Cohen asked or attempted to convince petitioner multiple times to tell his

12   side of the story and petitioner consistently refused.  Not once did petitioner begin to or attempt to

13   explain what happened.  Petitioner told Cohen generally that he would talk to him.  (ECF No. 46-

14   5 at 344.)  Petitioner also told Cohen the media reports of the crime were wrong, though he did

15   not explain how or why.  (<u>Id.</u> at 357.)  However, when Cohen asked any specific questions,

16   petitioner refused to respond, tried to change the subject, or delayed.  Petitioner also attempted to

17   talk with Cohen "off the record" but Cohen told him that because he was a police officer, "not

18   much off record with me."  (<u>Id.</u> at 356.)  The following exchanges demonstrate petitioner's

19   consistent refusal to describe what happened:

20        •   Cohen told petitioner it was important for officers to "catch up with" petitioner,

21            petitioner responded, "I'm not gonna say nothing."  (<u>Id.</u> at 344.)

22        •   Cohen asked "Tell me what happened out there."  Petitioner responded, "I'll talk

23            you but . . . I just don't want to do it here."  (<u>Id.</u> at 346.)

24        •   Cohen asked petitioner about the location of the gun.  Petitioner told him he would

25            talk about it when he got to Fairfield.  (<u>Id.</u> at 348.)

26        •   Cohen then repeated questions about his concerns someone might get petitioner's

27            gun.  Petitioner just repeated, "it's not here."  (<u>Id.</u> at 349-50, 352.)

28   ////

1        • When the interview moved to Fairfield, Cohen spent a good deal of time

2           attempting to convince petitioner to tell his side of the story or to tell him why the

3           media reports were incorrect.  Petitioner was obviously concerned that he may say

4           something that could be used against him at trial.  However, he told Cohen nothing

5           about what happened that night besides indicating that he was the person who shot

6           Thompson.  (Id. at 357-64.)

7        It is clear Cohen was aware that petitioner was refusing to talk about his side of the story

8    because Cohen continued to attempt to persuade petitioner to tell his story up until the end of the

9    second interrogation.  Cf. Hurd, 619 F.3d at 1089 ("[T]he interrogating officers' comments show

10   that they subjectively understood Hurd's responses as unambiguous refusals.").  This court finds

11   no ambiguity in petitioner's assertion of his right to refuse to answer questions about what

12   happened the night of the crime.

13       The point of Doyle, as stressed by the Ninth Circuit in Hurd, is that after being given

14   Miranda warnings, it is "'fundamentally unfair and a deprivation of due process' to allow a

15   suspect's silence to be used against him at trial." Hurd, 619 F.3d at 1089 (quoting Doyle, 426

16   U.S. at 618); see also Portuondo v. Agard, 529 U.S. 61, 74 (2000) (quoting Doyle, 426 U.S. at

17   618); Wainwright v. Greenfield, 474 U.S. 284, 295 (1986) (holding that "*Miranda* warnings

18   contain an implied promise, rooted in the Constitution, that silence will carry no penalty").  At no

19   point was petitioner informed that his refusal to talk could be used as an indicator of his guilt at

20   trial.  Petitioner's Fifth Amendment rights were violated by the prosecutor's use of petitioner's

21   silence during trial.

22                              **c.   Was the Error Harmless?**

23       The next question under Doyle is whether the testimony and argument regarding

24   petitioner's silence was harmless error.  On habeas, an error is not harmless if it "had substantial

25   and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 622, 637-

26   38 (quoting Kotteakos, 328 U.S. at 776).  This inquiry should be conducted de novo, "'without

27   benefit of such aids as presumptions or allocated burdens of proof.'" Hurd, 619 F.3d at 1090

28   (quoting Mancuso v. Olivarez, 292 F.3d 939, 950 n. 4 (9th Cir. 2002)).  If, after reviewing the

                                          30

1   "facts as a whole," the court can determine "with fair assurance that the judgment was not

2   substantially swayed by the error, we may conclude that the error was harmless." Id. (citing

3   Kotteakos, 328 U.S. at 765). "Otherwise, we must conclude that the petitioner's rights were

4   substantially and injuriously affected." Id. When considering the harmlessness of a Doyle

5   violation, considerations include: "(1) the extent of [the] comments ..., (2) whether an inference

6   of guilt from silence was stressed to the jury, and (3) the extent of other evidence suggesting [the]

7   defendant's guilt." Hurd, 619 F.3d at 1090 (quoting United States v. Velarde-Gomez, 269 F.3d

8   1023, 1034-35 (9th Cir. 2001) (en banc)); United States v. Newman, 943 F.2d 1155, 1158 (9th

9   Cir. 1991) (same).

10                       **(i)   The nature of the prosecutor's comments**

11          One of the themes of the prosecution's case was that petitioner never told anyone he acted

12   in self-defense until he appeared at trial.  During her closing argument, the prosecutor stressed

13   that petitioner had three years to come up with the story he told at trial, and yet that story

14   "defie[d] all logic."  (RT 1238 (ECF No. 55-14).)  The prosecutor's comments regarding

15   petitioner's silence were repeated and were very pointedly meant to equate petitioner's silence

16   with his guilt.  Some of those comments and questions were appropriate because they were not

17   directed at petitioner's interactions with Cohen after he was given Miranda warnings.  It is

18   possible that the Doyle error was harmless if the prosecutor's use of petitioner's silence during

19   the interrogation with Cohen was cumulative.

20          In other words, if it was just one aspect of the prosecution's overall introduction of

21   evidence and argument that petitioner's silence demonstrated his guilt.  However, that was not the

22   case here.  A review of the record shows that a primary focus of the prosecutor's comments and

23   questioning on the issue of petitioner's silence focused on petitioner's failure to tell Cohen that he

24   acted in self-defense.

25                       **(a)   References to failure to tell non-officers**

26          The prosecutor questioned several witnesses about petitioner's failure to tell people he

27   acted in self-defense.  The prosecutor asked Permenter whether petitioner told her, as he was

28   ////

1   leaving, that Thompson had pulled a gun on him or that Thompson had assaulted him. Permenter

2   responded that he had not. (RT 379 (ECF No. 55-11).)

3          In her cross-examination of petitioner, the prosecutor asked him if he had called the police

4   to tell them that Thompson had just tried to shoot him. (RT 792 (ECF No. 55-12); see also RT

5   828.) She went on to question him about the fact he never called the police. (RT 792.) The

6   prosecutor also asked petitioner to confirm his testimony on direct that the only thing he said to

7   Permenter as he was leaving involved his attempt to get his car keys from her. He testified that

8   he said nothing else to Permenter as he was leaving. (RT 792-93.) When the prosecutor asked if

9   he told Permenter that Thompson had just tried to shoot him or that he had acted in self-defense,

10  he responded that he did not. (RT 794.)

11         The prosecutor also asked defense expert Swanepoel, a criminalist who testified about the

12  crime scene, whether he had spoken with petitioner about what happened. Swanepoel testified

13  that he did not hear petitioner's side of the story. (RT 993 (ECF No. 55-13).)

14         During closing argument, the prosecutor argued that petitioner's story should not be

15  believed because of his actions immediately following the shooting, including that:

16             [A]t no point in time does he ever tell Katy May Permenter that this
               dude just tried to kill him. I mean, really? I mean, really think about
17             that.

18             Even if you buy this defendant's story as to why he didn't call the
               police, there is no way he would not have told Katy May Permenter
19             that, "Your buddy just tried to kill me."

20             I mean, think about that. If it had happened the way that he said it
               happened, first of all, I submit that he would have called the police,
21             he would have been the first person on the phone to call the police,
               because, well, all of the evidence would have supported him, right.
22             Had he not been trying to destroy evidence, everything would have
               been right there for the police to see. They could have seen that Mr.
23             Thompson had a gun, right.

24             But no, what does he do? He goes upstairs, gets his stuff, and then he
               leaves. And he never tells Katy May Permenter that Troy Thompson
25             tried to kill him.

26             Okay. What we do know what he said to Katy May Permenter is,
               "Don't say my name, bitch." Right?
27
    ////
28

                                                 32

1       Not the words of an innocent man, okay. Those are the words of a
2   man who knew that he just committed this murder and he doesn't
    want her to say anything, because he knows she's a witness.

3       It's absolutely incredible to think that somebody had just held a gun
    on this man and that he was afraid for his life and he never once
4   mentions it to Ms. Permenter at the scene.

5       So he takes these items from the scene, including this gun that he
    claims Mr. Thompson had, and what does he do with those items
6   next? Does he then go to the police department? Does he call the
    police? No. What does this defendant do? He decides that it would
7   be a great idea to bury the murder weapon.

8   (RT 1239-40 (ECF No. 55-14).)

9                         **(b)  References to failure to tell Cohen**

10      The prosecutor asked petitioner numerous questions on cross-examination about the fact

11  he never told Cohen the victim had threatened him, never told Cohen he shot Thompson in self-

12  defense, and never told Cohen his side of the story:

13      Q. But you never said to Detective Cohen: I know him. He's been
    threatening me, right?
14
    . . .
15
        Q. You never said that, right?
16
        A. I never said that.
17

18  (RT 847 (ECF No. 55-12).)

19      Q. And you didn't say to Detective Cohen that what in fact happened
    is Troy Thompson tried to kill you, right?
20
        A. I said it was the other way around.
21
        Q. At no point in time did you ever tell Detective Cohen that Troy
22  Thompson tried to kill you, right?

23      . . .

24      Q. Right?

25      A. I didn't say it out my mouth.  I said it was the other way around.

26      Q. Well, actually what you said, when you were talking about it being
    twisted up in the media, you said to Detective Cohen: You twist it up
27  in the media.

28      And he said: We don't have your side of it, do  we?

1              Right? That's what he said to you, right?

2              A. I believe so, yeah.

3              Q. And you said: No, y'all don't, right?

4              A. Right.

5  (RT 850-51.)

6              Q. At no point in time after he asked you that or after he told you
that, that he would investigate if you told him your side of what

7              happened, at no time did you ever say: Troy Thompson tried to kill
me and I shot him in self-defense, right?

8

9              A. Well, things happen in between, you know, that time.

                Q. So my question to you is

10

11             A . I didn't

12             Q. After he said that to you, the question is: You never told him: Troy
Thompson tried to shoot me and kill me and I had to kill him in self-

13             defense, right?

14             . . .

15             A. Can you ask me again.

16             Q. Okay. After Detective Cohen told you that if you gave him
information that was drastically different than what everybody else

17             is saying, he was going to go investigate that. After he told you that,
at no point did you ever tell him that Troy Thompson tried to shoot

18             you or tried to kill you and that you had to kill him in self-defense,
right?

19             A. I didn't say it, but I told him that I was going to tell him if I had
my attorney here. We was in the process of trying to make that

20             happen. So --

21             Q. Well, initially when you were in Sacramento, okay, and you're
talking to Detective Cohen, he asked you to tell your side of the story,

22             and in Sacramento, you told him: I don't want to talk to you in
Sacramento, right?

23

24  (RT 854-55.)

25             Q. And so once you were alone with Detective Cohen, okay, then he
said: Okay, we're alone, now tell me your side of the story, right?

26

27             A. Right.

                Q. And you still didn't tell him your side of the story, right?

28

1        . . .

2        Q. The question was you still didn't tell him your side of the story,
         right?
3
         A. No, I didn't tell him.
4
         Q. Now, earlier, one of your responses was you didn't tell him
5        because you didn't have -- because you didn't have a lawyer, is that
         what you said earlier?
6
         A. Yeah, I didn't want to really talk without a lawyer.
7
    (RT 858-59.)
8
         Q. You don't remember saying to him what if it's just manslaughter?
9
         A. Yeah, I remember saying that.
10
         Q. When you said:. What if it's just manslaughter, you didn't say:
11       Well, what if it's lawful self-defense, right?

12  (RT 860-61.)  The court sustained a defense objection to this question.

13       Q. At no point in time during the course of this conversation, did you
         ever mention self-defense to Detective Cohen, right?
14
         . . .
15
         Q. So the question was: At no point in time during the course of this
16       conversation, did you ever mention self-defense to Detective Cohen,
         right?
17
         A. I never told my side, no.
18
         Q. So that would be a yes, you've never mentioned self-defense
19       during those interviews, correct?

20       . . .

21       Q. So the answer to that would be correct, you never once mentioned
         the words self-defense in that interview, right?
22
         A. Right.
23
    (RT 864-65.)
24
            In her closing argument, the prosecutor argued:
25
         You know he was hiding, because one of the first things that he says
26       to Detective Cohen is, "How did you find me?" Right. I mean, the

27       first thing out of his mouth to Detective Cohen wasn't, "Oh, my God,
         you know, this person tried to kill me and I had to save myself." No.
28

                                      35

He's concerned about how did you all find me because I thought I had a good hiding place, I've been in hiding for ten days and how long have you been watching me. Right. That's his concern at that time.

So you know he wasn't there to visit buddies. He's there hiding because he knows the cops are after him.

You can definitely take that into consideration, when you're looking at whether or not this defendant has a consciousness of guilt about what he did. You can also take into consideration the statements that he gave to Detective Cohen. Because when he spoke to Detective Cohen, he kept saying he wanted to tell his side of the story. And you were able to listen to that conversation and you were also able to watch -- you were able to listen to the one in Sacramento, and you were able to watch the one in Fairfield.

And one of the things that I believe the evidence showed is that if you look at Detective Cohen and you listen to Detective Cohen, this is not a confrontational officer. This isn't a guy who was trying to make this defendant feel uncomfortable or Detective Cohen is about as likable a guy as you can get.

This is a guy who's talking with the defendant and wants to get his side of the story, right. Asks him twelve ways to Sunday what his side of the story is. And at any given time, this defendant could have told him, "This guy tried to kill me, so I shot him in self-defense."

And you've got to think about it like this: If it was you and you had been wrongly accused of something and you knew you had acted lawful, wouldn't the first thing out of your mouth be, "I did this in self-defense. This dude tried to kill me."

. . .

"I did this in self-defense because this dude tried to kill me."  That would be the first thing out of your mouth, right.

For whatever reason, maybe because he didn't realize the cops were on to him or whatever, but in those ten days, he definitely hadn't come up with a good enough story yet, because, well, you never heard it, right. What his story basically was, was I'll talk to you later.

THE COURT: Ms. Underwood, let me stop you one second. It is improper to put the case in the minds of individual Jurors. You can refer to the hypothetical reasonable person, but not individual jurors. So you are to disregard that portion of her argument.

MS. UNDERWOOD: A reasonable person, the first thing out of a reasonable person's mouth is, "This dude tried to kill me and I shot him in self-defense." That's not what this guy said, okay. And what

////

36

1   | he did say was, "I'm going to tell you my side of the story." But he
2   | had every reason in the world about why it had to be later.

3   (RT 1244-46 (ECF No. 55-14).)

4        Later, when arguing that defense expert Swanepoel was not a convincing witness, the

5   prosecutor noted that Swanepoel testified that he did not know petitioner's statement when he

6   derived his conclusions.  She then stressed that the she herself had not heard petitioner's story

7   until he testified at trial.  And, she exclaimed, "for God's sake, he didn't tell Detective Cohen."

8   (RT 1319 (ECF No. 55-14).)

9        **(ii)  The extent of other evidence of guilt**

10        The primary evidence disputing petitioner's declaration of self-defense was the testimony

11   of Pickett.  Pickett's testified that he saw petitioner fire shots at Thompson and that, after

12   Thompson had fallen to the ground, petitioner pointed down at him and fired a final shot.  Pickett

13   also testified that he did not see Thompson holding a gun or petitioner bending down to pick

14   anything up from the ground.  While the defense showed that memory in stressful situations can

15   be unreliable and that Pickett's story was not completely consistent each time he told it, the

16   defense did not show any motive for Pickett to lie.  Further, Pickett consistently described the

17   final shot down at Thompson.

18        The California Court of Appeal summarized the other, circumstantial evidence supporting

19   the jury's rejection of the self-defense theory:

20   | Defendant fled after he shot the victim and offered no assistance to
     | the wounded victim. Defendant told Permenter immediately after the
21   | shooting: "Bitch, you'd better not say my name."  Shaffer testified
     | that all seven of the casings were from the same gun, indicating that
22   | the victim had not shot a gun. The victim had five gunshot wounds,
     | and thus defendant continued to shoot after the victim had been
23   | injured. The five shots were in vital parts of Thompson's body:
     | Thompson was hit in the back, the stomach, twice in the chest, and
24   | in the back of his arm. There was testimony that the downward path
     | of the bullets indicated that the victim was shot while falling on the
25   | ground and with defendant directly over him. The firing of seven
     | shots, five that hit the victim, as well as the other circumstantial
26   | evidence supported a finding of implied malice.

27   Jackson, 2013 WL 3039798, at *21.

28   *////*

37

1    The only direct evidence that petitioner acted in self-defense was his testimony.  Petitioner

2   testified that after Thompson came back a second time to Permenter's apartment building, he got

3   his gun, opened the door, stood in the doorway, and asked Thompson "What's going on?"  (RT

4   679 (ECF No. 55-12).)  He then walked down the stairs as Thompson was walking from the

5   middle of the parking lot toward the staircase.  (RT 681.)  Petitioner testified that he could see

6   that Thompson still had one hand in his pocket.  Petitioner could see the outline of a gun through

7   Thompson's jacket.  (RT 681-83.)  Petitioner asked Thompson if he had a gun, but Thompson did

8   not respond.  Thompson came toward petitioner and petitioner began backing up.  (RT 684-85.)

9   Thompson then pulled a gun out of his pocket and pointed it at petitioner.  (RT 685-86.)

10   Petitioner backed up until he backed into a railing at the edge of the stairway.  Thompson told

11   petitioner he was going to kill him and Permenter, put the gun in petitioner's face, and cocked it.

12   (RT 686-88.)  Petitioner testified that Thompson had his finger on the trigger.  (RT 702.)

13   Petitioner testified that he backed up further, pulled his gun from his back pocket, and started

14   shooting.  (RT 688.)  Petitioner testified that he never shot Thompson while Thompson was on

15   the ground.  (RT 690.)  Thompson fell into a bush and dropped his gun in front of him.  Petitioner

16   testified that he saw Thompson getting up and was concerned Thompson might get the gun, so he

17   picked up Thompson's gun.  (RT 690, 706.)  He then retrieved his keys from Permenter.  He

18   testified that he never said to Permenter, "Bitch, don't say my name."  (RT 694.)

19    Other evidence supported petitioner's assertion of self-defense.  There was evidence that

20   Thompson had been violent with people in the past.  Petitioner testified that he was aware

21   Thompson had a reputation for violence.  (RT 731-36.)  In addition, both petitioner and

22   Permenter testified about Thompson's behavior that night – the multiple texts and phone calls,

23   pounding on Permenter's door, and yelling up at her apartment from the parking lot.  Both

24   Permenter and petitioner testified that Thompson had his hand in his pocket and, whether or not

25   Permenter in fact said to petitioner, "he's got a gun," both of their testimony showed that they

26   were concerned he may have one.

27    Petitioner's testimony that he took Thompson's gun was supported by DNA evidence

28   showing that both Thompson's and petitioner's DNA may have been on the gun found in the

38

1    Target bag in petitioner's rental car.  A defense forensic expert testified that she had a "fair

2    amount of certainty that this mixture of DNA [found on the gun] is coming from a mixture of the

3    DNA from Mr. Thompson and Mr. Jackson."  (RT 926-27 (ECF No. 55-13).)

4                         **(iii)  Analysis of Harmless Error**

5            On the one hand, there was significant evidence that petitioner did not act in self-defense.

6    Pickett's testimony, in particular, was damning.  Picket testified that he did not see Thompson

7    with a weapon, did not see petitioner bend down to pick anything up off the ground, and saw

8    petitioner shoot Thompson as Thompson lay on the ground.  Petitioner then told Permenter not to

9    say his name and said nothing to her about his need to have shot Thompson in self-defense.

10           On the other hand, petitioner's testimony was the key to his claim of self-defense.  The

11   only substantial evidence that supported petitioner's testimony that Thompson had a gun was the

12   expert testimony that the victim's DNA was likely on the gun later found in petitioner's car.

13   While the prosecution argued that there were a number of ways the victim's DNA could have

14   ended up there, and while petitioner's story about burying the victim's gun seemed far-fetched,

15   the fact of the DNA evidence was important.  That said, petitioner's credibility was extremely

16   important to his defense.  The prosecution did far more than mention petitioner's refusal to tell

17   Cohen he acted in self-defense.  Rather, the prosecutor focused on that fact and stressed that it

18   showed petitioner was not credible.

19           The test for determining the harmlessness of the Doyle error is not whether, absent the

20   testimony and arguments regarding petitioner's post-Miranda silence, the verdict would have

21   been the same.  See Kotteakos, 328 U.S. at 765 ("The inquiry cannot be merely whether there was

22   enough [evidence] to support the result, apart from ... the error.")  "It is rather . . . whether the

23   error itself had substantial influence.  If so, or if one is left in grave doubt, the conviction cannot

24   stand."  Id.  Further, "[w]here the record is so evenly balanced that a judge 'feels himself in

25   virtual equipoise as to the harmlessness of the error' and has '"grave doubt" about whether an

26   error affected a jury [substantially and injuriously], the judge must treat the error as if it did so.'"

27   Merolillo v. Yates, 663 F.3d 444, 454 (9th Cir. 2011) (quoting O'Neal v. McAninch, 513 U.S.

28   432, 435, 437–38 (1995)).

1    This court finds the harmlessness of the error difficult to determine with any certainty.

2    Rather, this court has grave doubts about whether the error affected the jury in a substantial way.

3    Accordingly, this court finds, on balance, that the error was not harmless.  The petition should be

4    granted on petitioner's Doyle claim.

5         **D.  Ineffective Assistance of Trial Counsel re Doyle Error**

6    Petitioner contends his trial attorney should have objected to the prosecutor's use of

7    petitioner's silence at trial.  However, petitioner's trial counsel did bring a pretrial motion to

8    exclude evidence and argument regarding petitioner's post-Miranda silence.  While the judge's

9    ruling was somewhat vague, he did specifically deny that motion with respect to questions and

10   argument regarding petitioner's failure to say he acted in self-defense.  (See RT 541 (ECF No.

11   55-11).)  The judge then stated that he need not rule on what the prosecutor could, or could not,

12   argue because that issue was not yet ripe.  (RT 542.).

13   Petitioner's trial attorney did not raise the issue again during the prosecutor's cross-

14   examination of petitioner or prior to the prosecutor's closing argument.  To establish ineffective

15   assistance of counsel, petitioner must show both that counsel acted unreasonably and that there is

16   a "reasonable probability" that had counsel acted reasonably, the result of the proceeding would

17   have been different.  Strickland v. Washington, 466 U.S. 668, 687, 694 (1984).  Based on the

18   analysis above, the trial attorney's failure to raise the issue again was unreasonable.  Trial counsel

19   knew the use of silence was objectionable and knew the trial court had not rendered a final ruling

20   on the issue.  A reasonable attorney would have objected to the prosecutor's questions and sought

21   to renew her motion to exclude argument regarding petitioner's silence prior to final closing

22   argument.

23   However, the analysis of prejudice is somewhat different than the analysis of harmless

24   error.  To determine prejudice under Strickland, this court considers whether the verdict would

25   have been affected had counsel objected to testimony and argument regarding petitioner's silence

26   and that testimony and argument had been excluded.  While this court feels the issue is, again,

27   very close, it finds a reasonable probability that at least one juror would have reached a different

28   verdict had the prosecutor been unable to elicit testimony about petitioner's silence and stress it

40

1    during argument.  On the basis of ineffective assistance of trial counsel for failure to object to the

2    prosecutor's use of petitioner's silence in violation of <u>Doyle</u>, this court recommends the petition

3    be granted.

4    **II.    Claim 2 – Ineffective Assistance of Appellate Counsel**

5            Petitioner contends appellate counsel was ineffective for failing to raise the issues that

6    petitioner raised in his supplemental brief on appeal.  As respondent points out, petitioner raised

7    those claims in both his supplemental brief, which was addressed by the Court of Appeal, and in

8    his state habeas petitions.  Therefore, the state courts had an opportunity to consider those claims.

9            Petitioner's only assertion of prejudice is that by failing to raise these claims, his appellate

10   counsel failed to preserve them for consideration on federal habeas review.  (ECF No. 46-1 at 41.)

11   However, there is no indication petitioner's claims are unexhausted or procedurally defaulted, and

12   respondent is not asserting those defenses.  Further, to the extent there are any statute of

13   limitations issues, respondent has waived them by failing to raise them in his answer.  <u>See Day v.

14   McDonough</u>, 547 U.S. 198, 202 (2006).  Therefore, petitioner fails to establish any prejudice

15   from appellate counsel's conduct and this claim should be denied.

16   **III.   Claim 3 – Ineffective Assistance of Counsel During Plea Negotiations**

17           Petitioner alleges that his trial counsel failed to consider any plea negotiations prior to trial

18   due to her romantic feelings for him.

19       **A.  Background**

20           This issue was raised in petitioner's 2016 state court habeas corpus petition.  (ECF No.

21   55-26 at 5-56.)  The superior court held an evidentiary hearing on the issue.  (<u>See</u> ECF Nos. 55-

22   23, 55-24.)  The superior court judge summarized the evidence regarding petitioner's relationship

23   with his trial attorney as follows:

24                   In support of his claim he presented cards and letters sent to him by
                     Ms. Lee. Ms. Lee authenticated these documents at the hearing. At
25                   least three of the letters contained graphic, sexually explicit
                     statements by Ms. Lee about her feelings towards petitioner, and her
26                   fantasies about the sexual activity she hoped they could engage in.
                     The first dated letter admitted into evidence at the hearing was a
27                   March 31 , 2011, letter from petitioner to Ms. Lee in which he told
                     her how much he adored and admired her and asked what her feelings
28                   for him were ("I am in the belief that this - no, 'we' means friends or

                                                    41

1

2

3

4

5

6

7

something deeper, are meant to be."). The first dated document from Ms. Lee to petitioner was a short, handwritten note dated May 10, 2011, in which Ms. Lee referred to petitioner as "my sweetheart" and expressed how much she loved and missed him. In some of these letters and cards Ms. Lee expressed a desire to marry petitioner and referred to herself as his wife. The last dated document from Ms. Lee to petitioner was a November 20, 2011, letter in which she characterizes their romantic relationship as unhealthy and unsustainable. Based upon the totality of the evidence, all of the correspondence from Ms. Lee to · petitioner appears to have been sent after his March 31, 2011, letter to her, i.e., over nine (9) months after petitioner was convicted at trial.

8

(Ex. O, ECF No. 55-25 at 3-4.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

The superior court judge then noted that in order to prevail on his claim, petitioner must show that is was "reasonably probable that a plea bargain which the petitioner was willing to accept would have been available for submission to the trial court for its approval or rejection." (Id. at 4.)  He found that the evidence showed that the "People were never prepared to make a voluntary manslaughter offer to petitioner despite their belief that he might be interested in such an offer."  (Id. at 5.)  The judge found petitioner's contention that "other plea bargain options might have been available to him" was "speculative" based on the testimony of Mr. Williamson, the chief deputy district attorney, and Ms. Underwood, the prosecuting deputy district attorney. In addition, the judge did not find credible petitioner's testimony that he would have been willing to accept an offer to plead to second degree murder on the eve of trial.  (Id.)   While the superior court judge thus rested his finding of no ineffective assistance of counsel on the failure to establish prejudice, he also noted that there was a "lack of credible evidence that [petitioner's relationship with his trial attorney] interfered with the pursuit of plea negotiations on petitioner's behalf."  (Id.)

23

**B.   Decision of the State Court**

24

25

26

27

28

After the superior court denied his claim, petitioner filed a petition for a writ of habeas corpus in the California Supreme Court.  (ECF No. 55-26 at 4-56.)  The California Supreme Court denied the petition without comment.  (Id. at 2.)  Therefore, for purposes of this court's review of the state court decision, the superior court's decision is the last-reasoned decision of the state court and the one this court must consider.

42

1

**C.  Was the State Court's Decision Contrary to, or an Unreasonable Application of, Clearly Established Federal Law?**

2

3   Petitioner makes little attempt to argue this claim.  That is understandable.  Whether or not

4   his trial counsel's conduct was unreasonable, petitioner makes no showing that it was prejudicial.

5   As the superior court found, petitioner fails to support his argument that he "would have taken a

6   plea deal to a much lesser offense" because petitioner fails to show that, had counsel acted

7   differently, any such plea deal would have been forthcoming.  The superior court made the

8   following factual findings:  (1) the government was never prepared to make a voluntary

9   manslaughter offer to petitioner; (2) petitioner's contention that other plea bargain offers were

10   available to him was speculative; and (3) petitioner's testimony that he would have been willing

11   to accept a plea offer to second degree murder on the eve of trial was not credible.  Those factual

12   findings are presumed to be correct.  28 U.S.C. § 2254(e)(1).  Petitioner must present "clear and

13   convincing evidence" to rebut the presumption.  Petitioner makes no attempt to do so.

14   Petitioner fails to carry his burden of showing the superior court's ruling was either

15   contrary to or an unreasonable application of federal law or was an unreasonable determination of

16   the facts under 28 U.S.C. § 2254(d).  Accordingly, claim 3 should be denied.

17   **IV.   Claim 4 – Exclusion of Evidence re Thompson's Violent Past**

18   Petitioner contends here that his Sixth Amendment and due process rights were violated

19   when the trial court refused to permit introduction of a police report related to the robbery of

20   Darryl Mercer and the proposed testimony of defense witness Terri Anderson.

21   **A.  Background**

22   On July 30, 2010, defendant filed his motion under Evidence Code section 1103, subdivision (a) to have the trial court admit violent character evidence of Thompson. This evidence, defendant argued, was relevant to show that he shot Thompson in self-defense.

23

24

25   Defendant argued: "Troy Thompson was known to carry a gun. He served a prison sentence for a violation of" Penal Code section 12021, subdivision (a)(1) "and for pimping. He committed an armed robbery and assault with a firearm against Darryl Mercer while personally armed. He has assaulted girlfriends who were also working for him as prostitutes—including Katrina Lanae Beckman and Terri Anderson. Sylvia Fracisco, another former girlfriend, also

26

27

28

43

had knowledge that Thompson owned a gun in the home, and will testify that he was violent towards her. Katy Permenter told police that she believed Troy Thompson returned to her apartment with a gun on the night of the incident. Physical evidence will be presented to corroborate that Thompson was in fact armed at the time of the incident. Thus, evidence of Thompson's violent and hot-tempered character, in the form of opinions, reputation, and specific acts, is admissible when offered by the petitioner to prove that the conduct of Thompson created the need for self-defense. (*See, e.g.,* Evid. Code, § 1103, subd. (a)(1).)"

Subsequently, on August 6, 2010, defendant submitted four reports by investigator Adams. The reports summarized interviews with Mercer and former girlfriends, Anderson, Beckman, and Fracisco. One report communicated the exchange on the telephone between Adams and Mercer. Adams asked Mercer, who was living in Arizona, about an incident involving Thompson in 2002. The report set forth the following: "Mercer said his memory of the incident is not as vivid anymore but that it was armed robbery and Thompson was the main offender. Mercer said he ... encountered ... Thompson, Thompson's mother, and some other people as he was walking past their home. Mercer said it was Thompson who had the firearm. Mercer said after the encounter, he saw some people up the street with a cell phone and yelled for them to call the police. Mercer said the suspects ran back inside of their house." Mercer added that he had known Thompson for quite some time and had never personally seen Thompson carrying a gun other than this one time when he was robbed. Mercer disclosed that he did not return to Fairfield to testify in the case against Thompson for robbery.

The report involving Anderson indicated that Adams contacted Anderson by telephone because she had discovered an arrest report from 2003 indicating that both Thompson and Anderson were arrested "in a prostitution sting in Sacramento." Anderson confirmed that she had been arrested and explained that she met Thompson while walking down the street in Fairfield. The report provided the following: "Anderson said she only prostituted for a couple of weeks in which she started turning tricks and giving Thompson all the money. Anderson said she prostituted two nights in Stockton before heading to Sacramento. Anderson said she was considered Thompson's girlfriend at the time in which he in turn paid for her expenses such as her hotel and food. Anderson admits that she is schizophrenic and was not taking her medications properly at the time."

When asked whether Thompson was ever violent towards her, Anderson said that he was. Adams's report stated as follows: "Anderson said Thompson didn't start hitting her until after the first few days. Anderson said if she rolled her eyes or if she didn't want to do something, Thompson would slap her. Anderson also advised that Thompson raped her twice. Anderson said that on one occasion Thompson wanted her to provide him oral sex and she didn't want to because she was tired from working. Thompson told Anderson that if she didn't give him oral sex she was going to get punched in the face. Anderson said she complied with Thompson's demands out of

44

fear." Additionally, Anderson noted that once she returned without any money and "Thompson beat her up really bad." Thompson, according to Anderson, "hit her repeatedly in her face with open hands." Thompson also hit her one time when she refused to put crack in her underwear. She reported that Thompson always carried "a [Derringer] with him and said it was because he was selling crack." Anderson said she relocated to San Jose after the arrest in 2003, and never heard from Thompson again.

On August 12, 2010, the trial court ruled that it was excluding "all evidence of prior bad acts of Thompson, subject to the receipt in evidence of evidence that would justify the giving of an instruction for self-defense regarding the shooting." The court continued: "So if at some point during the People's case, it's brought to my attention that sufficient evidence exists in the record, that would justify the giving of a self-defense instruction, then that's fine, but you can ask me to revisit the ruling then.... [T]hat doesn't mean that all of this is going to come in, because there are some [Evidence Code section] 352 issues, some of it is more probative than others on the violent nature of Thompson's conduct. Some of it is more remote."

After defendant's testimony, the trial court considered defendant's request to admit evidence and testimony under Evidence Code section 1103, subdivision (a). Counsel for defendant told the court that Mercer, although properly served in Arizona to attend the trial, had not arrived on the scheduled flight, and counsel was seeking to introduce Mercer's statement to police pursuant to Evidence Code section 1370 provided that she could obtain the police report. The police department had been unable to locate the report. The court ordered the prosecutor to make her best efforts to obtain the report.

The following day, August 19, 2010, the trial court announced that it would permit testimony about Thompson's violent character from Beckman, since she had "recent" knowledge about him. The court also granted the request to have the photograph of Thompson showing him holding a firearm pointed at the camera admitted into evidence. The court also permitted the recall of Permenter to answer more questions on the facts and circumstances related to Thompson's pulling a gun on her. The court did not make any ruling on the evidence related to Mercer.

The trial court ruled that it would not allow evidence regarding the 2003 battery and rape of Anderson. The court explained that Anderson reported that she was schizophrenic and not taking her medication at the time of the incident. The court also found that evidence of the rape did not show the same violent propensity to shoot someone and there was no evidence that Thompson was seeking to sexually attack Permenter or anyone else on the night of his death. The court added: "And I think for all of those reasons, and there [are] a few others that I considered, in terms of the time that this might require to really delve into a whole other incident that's now seven years old, and which one of the principal percipient witnesses is not present...." The court also noted that Anderson relocated in 2003 and had no further contact with Thompson.

45

On August 20, 2010, defense counsel informed the court that Officer Troy Oviatt had located the police report of the robbery of Mercer. The court found that all of the requirements of Evidence Code section 1370 had been satisfied.

A hearing was held outside the presence of the jury to determine whether the report should be admitted into evidence. Oviatt testified that he authored the 2002 report involving the robbery of Mercer. He, however, had no independent recollection of the events or the statements contained in the report.

The police report set forth the statement made by Mercer. Mercer stated that on November 18, 2002, he went to Thompson's apartment seeking $5 that Thompson owed him. Two women let him into the apartment and then would not let him leave unless he paid them $10. Thompson came down the stairs and asked Mercer why he was there. Mercer responded that he came to get the $5 Thompson owed him. Thompson answered: " 'I don't owe you money and you're not leaving. I have a gun on me. You all might not carry a gun but I always have a gun on me.' " Thompson then took "a black semi-automatic handgun with a long barrel" out of his jacket and pointed it at Mercer. Thompson told Mercer: " 'Break yourself. You got money on you, break yourself.' " The two women took items from Mercer's pockets while Thompson pointed the gun at Mercer. The women removed keys, a $20 bill, a $10 bill, and between three to six $1 bills from Mercer's pockets. One of the women opened the door and, as Mercer turned to leave, one of the women punched him in the face. Thompson then hit Mercer on his left shoulder with either his fist or with the gun. Mercer was also kicked as he left. Mercer went to another apartment and told the people to call the police.

The police responded and detained the two women and Thompson. The police found money and keys, which Mercer identified as belonging to him, on Thompson. The police did not find a firearm, but they found twelve .22 caliber bullets in a container in the apartment. The suspects were arrested and charged with robbery and other crimes.

At the police station, Thompson refused to talk to the police but one of the woman indicated that she understood her rights and that she wanted to talk. She said that she had known Mercer for about four years and that she had asked him in the past not to come to her apartment. She asked him if he had the $30 he owed her and Mercer answered that he did not have any money. They then argued. She stated that Mercer "is crazy and everybody knows he is nuts and that he is a liar." She claimed that Mercer then left. She maintained that no gun was pointed at Mercer. She maintained that "she had no idea what [the police officer] was talking about" when told that Mercer's keys and money were found in Thompson's pocket. She insisted that "whatever happened was" Mercer's fault.

The second woman also wanted to talk and she denied ever being inside the apartment. She stated that she was walking by the apartment when she spotted Thompson hitting and kicking Mercer "in the butt." She said the two men were yelling and cussing at each

other and that she did not see a gun. When asked whether she knew Mercer, she responded: " '[E]verybody knows him, he sells crack and pulls knives on people.' "

The prosecutor informed the court that the charges against Thompson were dismissed at the preliminary hearing. Defense counsel said that a minute order showed that the dismissal occurred because Mercer failed to appear. The prosecutor argued that she had learned only the day before that the defense was intending to introduce this report and had been provided insufficient notice.

The trial court found that Mercer was an unavailable witness and that the statements attributable to him were made to a law enforcement official near the time of the alleged threat. The court also found that the incident was within five years of the filing of the instant prosecution and thus the issue was "whether the statement was made under circumstances that would indicate its trustworthiness." After hearing argument on this latter issue, the court refused to permit the report to be entered into evidence under Evidence Code section 1370 because it could not "legitimately conclude that this was made under circumstances that would indicate its trustworthiness."

The court pointed out that some circumstances tended to show the report's trustworthiness but no gun was located, another witness who had not been arrested did not indicate that a gun had been used, and both of the women claimed that Mercer was crazy or a liar. The court also emphasized that Mercer twice failed to appear in court. Furthermore, the main issue the defense wished to show was that Thompson had a gun but no gun was located.

Defense counsel then renewed the request to allow Anderson to testify. The court denied the request and stated that this evidence was cumulative and less probative. The court stated that the defense could have Fracisco testify because Beckman's testimony had been contrary to the defense's expectation. After the defense reported that it was unlikely to produce Fracisco, the trial court permitted the defense to submit documentary evidence that Thompson had been convicted for being an ex-felon in possession of a firearm.

Jackson, 2013 WL 3039798, at *9-12.

## B. Decision of the State Court

Petitioner raised these claims in his appeal.  The Court of Appeal considered petitioner's arguments that the trial court's refusal to permit the defense to introduce Mercer's statement in the police report and refusal to allow Anderson's testimony violated the California Evidence Code and his due process right to present a defense.  With respect to petitioner's claim regarding Mercer's statement, the Court of Appeal held that the trial court did not abuse its discretion when

////

47

it disallowed the statement because it was not trustworthy and, further, even if there was error, it was harmless.

> In the present case, Mercer made the statement to the police in anticipation of litigation and, since he was the victim, he was clearly interested in the litigation. (Evid. Code, § 1370, subd. (b)(1).) In addition, the surrounding circumstances tended to show that the statement was untrustworthy. Another witness who was not arrested but heard the comments between Mercer and the two women did not hear any reference to a gun during the incident. This witness heard an argument about money but heard nothing to indicate that a robbery was taking place. Indeed, the police appeared shortly after the incident but they did not find any gun in the apartment or on Thompson.

> Furthermore, when interviewed by Adams, Mercer's rendition of what happened differed significantly from his earlier statement to the police. Mercer reported to Adams that Thompson had a gun and that Thompson robbed him when he passed Thompson, Thompson's mother, and others in front of their house. He did not state that he went into the house and did not assert that Thompson pointed the gun at him. In the police report there was no mention of Thompson's mother.

> Finally, the court considered the fact that Mercer did not appear in 2003 for the scheduled trial of Thompson. He again failed to appear in the present case despite being subpoenaed.

> Defendant argues that Mercer's statements were trustworthy and relies on *Chambers v. Mississippi* (1973) 410 U.S. 284 and *Chia v. Cambra* (9th Cir.2004) 360 F.3d 997. These cases hold that the hearsay rule might not apply when the out-of-court declaration has persuasive assurances of trustworthiness. (*Chambers*, at p. 302; *Chia*, at p. 1003.) Defendant points out that the details Mercer gave regarding the exact amount of money that Thompson took from him matched the sums of money the police found on Thompson. When the police searched Thompson's jacket, they found one bundle of bills amounting to $95 and a second bundle of bills amounting to $36, which were precisely the amounts Mercer claimed Thompson took from him. Additionally, the police found Mercer's keys in Thompson's jacket pocket.

> Defendant argues that the statements by the two women were untrustworthy and the witness who did not hear anything about a gun was in a different room and not present during the assault. Defendant also dismisses the significance of Mercer's failure to appear to testify at the preliminary hearing in 2002 and in the present proceeding. He points out that Mercer moved to Arizona and his failure to appear has no bearing on his trustworthiness.

> We disagree with defendant that the trial court abused its discretion in finding that Mercer's statements were untrustworthy. Mercer claimed that Thompson pointed a gun at him but no gun was ever recovered and there was no corroborative evidence to support this

48

1         statement. The fact that Mercer's rendition of events to Adams differed significantly from what he told the police was also significant. We also disagree with defendant's argument that Mercer's failure to appear at Thompson's preliminary hearing or the current murder trial of defendant was insignificant. It indicated that Mercer had some reason for not wanting to testify and repeat the statements that he had made to the police. The record contains no evidence suggesting that Mercer failed to appear simply because he now lives in Arizona.

        Accordingly, we conclude that the trial court did not abuse its discretion in refusing to admit the police report regarding Thompson's robbery of Mercer. Furthermore, any error was harmless under *Watson*. As already noted, the jury heard evidence that Thompson had a gun. The picture of Thompson with a gun as well as the evidence of his prior conviction of being a felon in possession of a firearm were far more persuasive than Mercer's uncorroborated statement that Thompson had a gun when he robbed him. Furthermore, as already noted, the jury heard other evidence that Thompson had been violent in the past. Accordingly, even if Mercer's statement to the police had been admitted, it is not reasonably probable that there would have been a different verdict.

Id. at *15-17.

     With respect to petitioner's claim regarding the exclusion of Anderson's testimony, the state court again concluded that the exclusion of the evidence was not error and, even if it was, the error was harmless.

        In the present case, defendant has failed to show that the trial court's decision to exclude Anderson's testimony under Evidence Code section 352 was " 'arbitrary, capricious or patently absurd' " and " 'resulted in a manifest miscarriage of justice.' " (*People v. Gutierrez*, supra, 45 Cal.4th at p. 828.) Defendant argues that the trial court excluded the evidence because it found that the rape of Anderson was not probative of a character trait for physical violence. He maintains that the court could have excluded any testimony on the sexual assaults and permitted her to testify about Thompson's physical abuse.

        The trial court, however, did not refuse to let Anderson testify simply because it found that the sexual assaults were not sufficiently similar to the incident involving defendant and Thompson. The trial court concluded that the evidence was not particularly probative because Anderson had no contact with Thompson since 2003 and thus she did not know if he was still carrying a gun. The evidence was cumulative because the jury heard evidence that Thompson was violent and that he sometimes had a gun.

        Defendant complains that the jury heard little evidence regarding Thompson's propensity for violence. He acknowledges that he testified about what he knew about Thompson's propensity for

1
2

> violence, but the jury was instructed to consider his testimony "for the limited purpose of showing its effect on the defendant and not for whether it's true or false."

3
4
5
6
7

> Defendant downplays the significant evidence in the record evincing Thompson's character. Beckman testified that Thompson slapped her once and the jury heard Adams's testimony that Beckman told her that she separated from Thompson because of the physical abuse. Permenter disclosed that Thompson had pulled a gun on her. Additionally, the court admitted documentary evidence that Thompson had a conviction for being an ex-felon in possession of a firearm and the jury saw the e-mail sent to Permenter containing a photograph of Thompson holding a firearm pointed at the camera.

8
9
10
11
12
13
14
15
16
17

> Given the plentiful evidence that Thompson had a firearm and was violent, the trial court did not act improperly when it ruled that Anderson's testimony was inadmissible. Anderson's contact with Thompson was more than two years before his death and thus had no recent information about his character. Additionally, Anderson admitted that she is schizophrenic and had not been taking her medication at the time she knew Thompson. Thus the trial court properly weighed its concerns that Anderson's testimony would require a mini-trial on precisely what happened between Anderson and Thompson more than two years ago and whether her mental condition had clouded her memory or distorted her perception of events. Even if we were to presume that the trial court should have permitted Anderson to testify, any error was harmless under Watson. As already discussed, the evidence had limited probative value because of its remoteness. Moreover, as already discussed, the jury heard evidence that Thompson could be violent and that he carried a firearm. Accordingly, it is not reasonably probable that there would have been a different result had the jury heard Anderson's testimony.

18
Id. at *14-15.

19
**C.  Legal Standards**

20
      "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a

21
complete defense.'"  Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v.

22
Trombetta, 467 U.S. 479, 485 (1984)).  It is also true, however, that "state and federal rulemakers

23
have broad latitude under the Constitution to establish rules excluding evidence from criminal

24
trials."  Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting United States v. Scheffer,

25
523 U.S. 303, 308 (1998)).  "Such rules do not abridge an accused's right to present a defense so

26
long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"

27
Scheffer, 523 U.S. 303 at 308 (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)).  A rule is

28
"arbitrary" where it "exclude[s] important defense evidence but ... [does] not serve any legitimate

1    interests."  Holmes, 547 U.S. at 325.  "[A] federal habeas court may overturn a state court's

2    application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists

3    could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'"

4    Nevada v. Jackson, 569 U.S. 505, 508-09 (2013) (quoting Harrington v. Richter, 562 U.S. 86, 102

5    (2011)).  "Only rarely [has the Supreme Court] held that the right to present a complete defense

6    was violated by the exclusion of evidence under a state rule of evidence."  Id. at 509.

7         The United States Supreme Court has not "squarely addressed" whether a state court's

8    exercise of discretion to exclude testimony violates a criminal defendant's right to present

9    relevant evidence.  Moses v. Payne, 555 F.3d 742, 758-59 (9th Cir. 2009).  Also, the Court has

10   not clearly established a "controlling legal standard" for evaluating discretionary decisions to

11   exclude such evidence.  Id. at 758; see also Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011)

12   ("Between the issuance of Moses and the present, the Supreme Court has not decided any case

13   either 'squarely address[ing]' the discretionary exclusion of evidence and the right to present a

14   complete defense or 'establish [ing] a controlling legal standard' for evaluating such

15   exclusions.").  Rather, the Supreme Court has focused only on whether an evidentiary rule, by its

16   own terms, violated a defendant's right to present evidence, and found that AEDPA does not

17   permit a federal habeas court to conclude that a state court's discretionary exclusion of evidence

18   pursuant to a valid evidentiary rule violated clearly established Supreme Court precedent.  Moses,

19   555 F.3d at 756–60; Horell, 644 F.3d at 983.

20        Subsequently, the Supreme Court held that its precedent did not clearly establish that the

21   Constitution "requires a case-by-case balancing of interests" before a state rule precluding the

22   admission of extrinsic evidence to impeach a witness could be enforced.  The Court held that it

23   "has never held that the Confrontation Clause entitles a criminal defendant to introduce extrinsic

24   evidence for impeachment purposes."  Jackson, 569 U.S. at 509-11 (exclusion of evidence under

25   state law for the purpose of focusing the fact-finder and conserving judicial resources was

26   appropriate and did not impinge on a defendant's right to present a complete defense.).

27        The Ninth Circuit has noted that "under AEDPA, 'even clearly erroneous' evidentiary

28   errors 'that render a trial fundamentally unfair may not permit the grant of federal habeas corpus

1    relief if not forbidden by 'clearly established federal law,' as laid out by the Supreme Court.'"

2    Hale v. Cate, 530 F. App'x 636, 637 (9th Cir. 2013) (quoting Holley v. Yarborough, 568 F.3d

3    1091, 1101 (9th Cir. 2009)).  Moreover, while Moses only addressed the exclusion of expert

4    testimony under a Washington state statute, both the Ninth Circuit and district courts in this

5    circuit have since extended the holding in Moses to preclude habeas claims arguing that exclusion

6    of other, non-expert evidence by state courts was contrary to, or an unreasonable application of,

7    controlling Supreme Court precedent, or warranted habeas relief under AEDPA.  See, e.g., Smith

8    v. Small, 697 F. App'x 538 (9th Cir. 2017) (California court's decision to exclude defense

9    witness testimony was not contrary to or an unreasonable application of clearly established

10   Supreme Court precedent); Borges v. Davey, 656 F. App'x 303, 304 (9th Cir. 2016) (California

11   court's exclusion of proposed cross-examination pursuant to Cal. Evid. Code § 352 because

12   questioning would be cumulative and time-consuming did not warrant habeas relief under

13   AEDPA); Dugger v. Brown, 469 F. App'x 534 (9th Cir. 2012) (Supreme Court has established no

14   controlling legal standards to evaluate a state court's decision to preclude defense impeachment

15   testimony under Cal. Evid. Code § 352); see also Gentry v. Grounds, No. 2:13-cv-0142 WBS

16   KJN P, 2015 WL 3733395, at *10 (E.D. Cal. June 11, 2015) (state court's decision to exclude

17   defense impeachment evidence under Cal. Evid. Code § 352 did not violate any clearly

18   established federal law under § 2254(d)), rep. and reco. adopted, No. 2:13-cv-0142 WBS KJN P

19   (E.D. Cal. July 10, 2015); Chein v. Powers, No. CV 13-0126 ABC (AN), 2013 WL 6535301, at

20   *10 (C.D. Cal. Dec.13, 2013) (state trial court's exclusion of proposed defense evidence

21   regarding conduct of victim because it was irrelevant did not warrant habeas relief under

22   AEDPA); White v. Knipp, No. 2:11-cv-3016 TLN DAD P, 2013 WL 5375611, at *19 (E.D. Cal.

23   Sept. 24, 2013) (state court's exclusion of third party culpability evidence did not warrant relief

24   under AEDPA), rep. and reco. adopted, No. 2:11-cv-3016 TLN DAD P (E.D. Cal. Nov. 18,

25   2013).

26   ////

27   ////

28   ////

1
2

**D.  Was the State Court's Decision to Exclude the Statement of Mercer and Testimony of Anderson Contrary to, or an Unreasonable Application of, Clearly Established Federal Law?**

3          In challenging both the exclusion of Mercer's statement under Evidence Code § 1370 and

4    Anderson's testimony under Evidence Code § 352, petitioner does not challenge the validity of

5    either California rule itself.  Rather, petitioner challenges the state court's decisions under those

6    rules.  For purposes of analysis under § 2254(d)(1), the state appellate court's decision that the

7    trial court did not abuse its discretion in excluding Mercer's statement as untrustworthy and

8    Anderson's testimony as cumulative, remote-in-time, and minimally probative cannot be said to

9    violate any clearly established holding of the Supreme Court.  See Moses, 555 F.3d at 758-60; see

10   also Jackson, 569 U.S. at 511.  The Supreme Court has not clearly established a controlling legal

11   standard for evaluating a trial court's discretionary decision to exclude defense evidence in

12   general or witness testimony in particular.  Cf. Hale, 530 F. App'x at 637 (rejecting claim that

13   right to present a defense was violated by exclusion of testimony of eyewitness expert, because

14   there was no Supreme Court precedent establishing a constitutional right to eyewitness

15   testimony).  Given the absence of Supreme Court precedent, the state appellate court's rejection

16   of petitioner's constitutional claim could not be contrary to, or an unreasonable application of,

17   clearly established federal law.  See Horell, 644 F.3d at 983; Moses, 555 F.3d at 758-59; see also

18   Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) (Section 2254(d)(1) is not satisfied when a

19   state court has "decline [d] to apply a specific legal rule that has not been squarely established by"

20   the Supreme Court.").

21          Even assuming he has shown constitutional error, petitioner fails to show prejudice.  First,

22   petitioner cites the wrong legal standard for determining prejudice.  He contends the meet this

23   court should apply the Chapman harmless error standard.  Under Chapman, an error is only

24   harmless if it can be said beyond a reasonable doubt that the error did not contribute to the

25   verdict.  Chapman v. California, 386 U.S. 18, 25 (1967).  The applicable standard on habeas is

26   much more difficult to meet.  Assuming the state appellate court wrongly upheld the trial court's

27   evidentiary decision regarding Mercer's statement and Anderson's testimony, petitioner could

28

53

1    only succeed on these claims if he shows that the error had a "substantial and injurious effect or

2    influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 623.  As explained by the state

3    appellate court, any error was harmless because the jury heard evidence that Thompson had a

4    gun, that he had a violent past, and that petitioner was aware of Thompson's reputation for

5    violence.  Additional evidence on those subjects would not have affected the verdict in any

6    substantial way.  In sum, petitioner has failed to establish the state Court of Appeal's rejection of

7    his claim was contrary to or an unreasonable application of clearly established federal law.  It

8    should be denied under 28 U.S.C. § 2254(d)(1).

9                                                    **CONCLUSION**

10          For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's petition

11   for a writ of habeas corpus be granted on the bases that: (1) the prosecutor's questions and

12   argument regarding petitioner's post-<u>Miranda</u> silence violated petitioner's Fifth Amendment

13   rights, and (2) petitioner's Sixth Amendment right to the effective assistance of counsel was

14   violated by his trial attorney's failure to object to the prosecutor's questions and argument

15   regarding petitioner's silence.  In all other respects, the petition should be denied.

16          These findings and recommendations will be submitted to the United States District Judge

17   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

18   after being served with these findings and recommendations, any party may file written

19   objections with the court and serve a copy on all parties. The document should be captioned

20   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

21   objections shall be filed and served within seven days after service of the objections.  The parties

22   are advised that failure to file objections within the specified time may result in waiver of the

23   right to appeal the district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  In the

24   objections, the party may address whether a certificate of appealability should issue in the event

25   an appeal of the judgment in this case is filed.  <u>See</u> Rule 11, Rules Governing § 2254 Cases (the

26   ////

27   ////

28   ////

1   district court must issue or deny a certificate of appealability when it enters a final order adverse

2   to the applicant).

3   Dated:  June 29, 2020

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DB/prisoner-habeas/jack2268.fr